**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| Allergan, Inc.,<br>Allergan Pharmaceuticals<br>Ireland Unlimited Company,<br>Allergan USA, Inc., and Allergan Sales, LLC,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>Revance Therapeutics, Inc.,<br><br>　　　　　Defendant. | Civil Action No. _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs Allergan, Inc., Allergan Pharmaceuticals Ireland Unlimited Company, Allergan USA, Inc., and Allergan Sales, LLC (collectively, "Allergan"), by their undersigned attorneys, bring this action against Defendant Revance Therapeutics, Inc. ("Revance") alleging as follows:

## INTRODUCTION

1.　　　This is a case about the unlawful acts of a company desperate to compete with Allergan, a pioneer in botulinum neurotoxin ("BoNT") injectable products and dermal fillers. That company, Revance, has taken shortcuts by misappropriating trade secrets and repeatedly poaching multiple Allergan employees with access to those secrets. In attempting to accelerate the development of its BoNT injectable products and the marketing and sales of those products and its dermal fillers, Revance is unfairly exploiting the enormous efforts and financial commitment that Allergan devoted to its flagship products, Botox and Botox Cosmetic injectable products (collectively, "Botox") and Juvéderm dermal fillers.

2.　　　Allergan, through decades of innovative research, is well-known in the market for having introduced the safe and effective use of injectable BoNT products. Allergan pioneered

the harnessing of BoNT, one of the world's most dangerous substances, to obtain regulatory approval for Botox throughout the world.  The hundreds of sponsored studies backed by the manufacture of more than 100 million vials of Botox speak for themselves.  All of that work has resulted in highly valuable and closely guarded Botox trade secrets involving critical R&D, characterization, and manufacturing-related information, regulatory strategies, and business intelligence.  Years of sales and marketing efforts, in addition to significant research and development work, have also led to the commercial success of Allergan's Juvéderm line of dermal filler products.

3.      Conversely, Revance started in 1999 as a company focused on topical applications.  Revance spent roughly 15 unsuccessful years trying to develop and commercialize a topical BoNT formulation (RT001).  Weary of repeated flops in bringing a topical product to market, Revance discontinued its efforts in 2016 and pivoted to other potential products.

4.      First, Revance developed an injectable BoNT product (RT002) to directly compete with Botox.  Revance obtained FDA approval for RT002 in September 2022, and has just started to launch that product under the trade name "Daxxify," using a group of sales personnel called "Prestige Aesthetic Consultants."  Revance is now pursuing post-marketing approval requests related to Daxxify, expansion of its regulatory filing to cover new indications, and approval for Daxxify outside the United States.

5.      Second, in addition to Daxxify, Revance has repeatedly claimed to be on the doorstep of filing regulatory papers seeking approval for a copycat "biosimilar" to Botox.

6.      Third, in addition to competing with Allergan in the injectable BoNT field, Revance has turned to marketing a set of licensed dermal filler products called "RHA" to the

same prescribers, medical spas, and other customers targeted by Allergan's Juvéderm line of dermal fillers.

7.    So how did Revance manage to introduce its Daxxify and RHA products to the market, and be on the verge of a biosimilar version of Botox?  Aiming to turn the tide of its years of failures, Revance, with the aid of key former Allergan executives and employees, accelerated a plan to recruit key Allergan employees with knowledge and access to the trade secrets that Allergan uses to develop and manufacture Botox, and to market both Botox and Juvéderm. Revance filled its ranks with many former Allergan employees, ranging from regulatory professionals and manufacturing scientists to marketing executives, sales people, and even in-house lawyers.  Revance solicited and induced Allergan employees to conceal their plans to join the competition.

8.    To further Revance's illicit scheme, these former Allergan employees lied or refused to disclose their Revance offers of employment to maintain access to Allergan's trade secret information as long as possible—information that would be crucial in their new roles. Allergan employees recruited by Revance engaged in misconduct by viewing and downloading Allergan's most sensitive data after securing employment with Revance, transferring confidential information to their personal email or other personal accounts, sharing information with Revance, and even using it to create a business plan for Revance.  Revance then strategically placed the former Allergan employees into positions where they, and Revance, could easily leverage Allergan's trade secret information to gain an unfair competitive edge.  These new positions at Revance called for the precise information that they had developed, accessed, and/or taken from Allergan.  Indeed, it would be very challenging (if not impossible) to produce a biosimilar imitating Botox without access to the following highly confidential and trade secret

materials: structural characterization and elucidation studies, the Botox reference standard, and strategies for determining potency.

9. Revance was well aware that its conduct could lead to litigation, and even warned its shareholders and potential investors of the serious litigation risks:

- "[T]o the extent we hire personnel from our competitors, such personnel will usually be subject to restrictive covenants with their former employers, including non-competition, non-solicitation and/or confidentiality provisions. . . . . **We may be subject to allegations and litigation that these personnel have** violated the non-competition clauses**, been improperly solicited or divulged to us proprietary or other confidential information of their former employers."**

- "In addition, in some situations, **[Revance's agreements with its employees] may conflict with, or be subject to, the rights of third parties with whom our employees, consultants, collaborators or advisers have previous employment** or consulting relationships."

Revance Therapeutics, Inc., Form 10-K (Feb. 28, 2023) (emphasis added).

10. Revance's use of employee raiding to gain access to Allergan's trade secret information—which Allergan understands is ongoing to this day—was designed to give Revance an unfair advantage in the marketplace and weaken Allergan's Botox and Juvéderm business.

11. Allergan seeks relief from this Court for damages suffered as a result of this unlawful conduct and to enjoin further irreparable harm to Allergan's business.

## THE PARTIES

12. Plaintiff Allergan, Inc. is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 1 North Waukegan Road, North Chicago, Illinois 60064. Allergan, Inc. is an indirectly wholly owned subsidiary of AbbVie Inc.

13. Plaintiff Allergan Pharmaceuticals Ireland Unlimited Company is a private unlimited company organized and existing under the laws of the Republic of Ireland with a

registered office at Castlebar Road, Westport, County Mayo, Ireland. Allergan Pharmaceuticals Ireland Unlimited Company is an indirectly wholly owned subsidiary of AbbVie Inc.

14. Plaintiff Allergan USA, Inc. is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 1 North Waukegan Road, North Chicago, Illinois 60064. Allergan USA, Inc. is an indirectly wholly owned subsidiary of AbbVie Inc.

15. Plaintiff Allergan Sales, LLC is a Delaware limited liability company having a place of business at 1 North Waukegan Road, North Chicago, Illinois 60064. Allergan Sales, LLC is an indirectly wholly owned subsidiary of AbbVie Inc.

16. Defendant Revance is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at 1222 Demonbreun Street, Suite 2000, Nashville, Tennessee 37203.

## JURISDICTION AND VENUE

17. This action arises, in part, under the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836, and the Tennessee Uniform Trade Secrets Act, Tenn. Code Ann. § 47-25-1701 *et seq.*

18. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under the DTSA. 18 U.S.C. § 1836 (c).

19. This Court possesses supplemental jurisdiction over Allergan's state-law claims pursuant to 28 U.S.C. § 1367(a) because Allergan's state law claims derive from a common nucleus of operative facts.

20. Revance is subject to personal jurisdiction in this District because, *inter alia*, its principal place of business and corporate headquarters are based in Nashville, Tennessee.

5

21.     Venue is proper in this District as to Revance pursuant to 28 U.S.C. § 1391(b)(1) because its principal place of business and corporate headquarters are based in Nashville. Company direction, such as product and business decisions, corporate management, administration, recruiting, sales, marketing, and training, runs through Revance's Nashville headquarters.  Revance conducts sales, marketing, and training efforts with practitioners and key opinion leaders through its Nashville headquarters.  Revance also conducts drug approval regulatory work out of its Nashville headquarters, and has actively recruited regulatory professionals to that location.  Employees hired by Revance, including former Allergan employees, reside in Tennessee and work in Revance's Nashville headquarters.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.     Allergan's Pioneering Botox and Juvéderm Products, and Innovation in the Botulinum Toxin Pharmaceutical Market

#### A.     Allergan's Botox and Juvéderm Products

22.     The bacterium *Clostridium botulinum* produces extremely poisonous toxins. BoNT is considered among the most lethal natural biological agents, and exposure to BoNT can lead to the development of botulism, a rare and serious condition characterized by muscle paralysis, difficulty breathing, and potentially death.

23.     Through extensive research and large-scale clinical trials, Allergan and its predecessors pioneered the harnessing of botulinum toxins for use as safe and effective FDA-approved therapies, and these innovations have made Allergan the market leader in this field.  Allergan markets these therapies under the well-known, commercially successful, and trusted Botox brand, which is FDA-approved for therapeutic and aesthetic uses.  With more than 100 sponsored studies backing the more than 100 million vials of Botox manufactured worldwide since product launch, physicians, healthcare providers, and patients continue to trust Allergan's

products as reliable and effective treatment options. In 2022, Botox accounted for nearly $4 billion of sales in the United States.

24. In addition to Botox, Allergan also markets the FDA-approved Juvéderm dermal filler line of products, including Juvéderm Ultra XC, Juvéderm Ultra Plus XC, and Juvéderm Voluma XC (collectively, "Juvéderm."). Juvéderm temporarily adds volume to facial tissues and restores a smoother appearance to the face. In 2022, Juvéderm accounted for more than $500 million of sales per year in the United States.

25. Reflecting the value of the Botox and Juvéderm franchises, as well as its proprietary technology, AbbVie Inc. acquired Allergan plc for $63 billion in May 2020. The Botox franchise was a centerpiece to the deal, and Juvéderm was also a key asset. *See, e.g.*, AbbVie Inc., Press Release (May 8, 2020) ("Allergan provides new growth opportunities in Neuroscience, with Botox® Therapeutics, Vraylar® and Ubrelvy™ and a global aesthetics business, with leading brands including Botox® and Juvéderm®").

26. Allergan's development of confidential and proprietary know-how concerning BoNT regulatory, technical, and manufacturing efforts has been critical to Botox's success, including, for example, the characterization of Botox and potency testing techniques, which are often called "potency assays."

27. Allergan's long-running success with Botox and Juvéderm has also resulted in highly sensitive and secret competitive business intelligence and sales/marketing strategies, including customer lists and market analysis, which Allergan maintains as confidential.

**B. Botox Characterization, Potency, and Reference Standard**

28. Allergan has invested, and continues to invest, significant resources to understand the highly complex and nuanced aspects of Botox, including its BoNT drug substance.

29.     For example, Allergan's elucidation studies directed to the structure and characterization of Botox's drug substance, the associated standard operating procedures and protocols, and the results of these studies are highly confidential and proprietary trade secrets.

30.     To obtain approval for a BoNT product, the FDA and other regulatory agencies around the world mandate that strict quality and safety standards be satisfied, including with respect to the assessment of drug substance (*i.e.*, BoNT) potency as well as drug product (*i.e.*, the finished dosage form containing BoNT) potency.  This requires significant know-how, as demonstrating acceptable potency levels for BoNT products is unlike any other class of therapeutics.  For example, there is no agreed-upon international potency reference standard, which means each manufacturer uses a unique reference standard specific to its own product. Allergan's unique potency reference standard is used to determine whether manufactured lots of Botox drug substance and drug product fall inside or outside of acceptable potency levels.  This reference standard, as well as the associated standard operating procedures, protocols, and data, are collectively referred to as the "Botox Reference Standard."  The Botox Reference Standard is a highly confidential and proprietary trade secret.

31.     The FDA requires applicants to assess potency of BoNT products using an assay. For years, the primary way to assess potency was through use of *in vivo* LD50 mouse lethality test, which is a bioassay that generally involves administering serial dilutions of BoNT to groups of mice.  To help avoid the use of animal testing, Allergan has advanced an alternative BoNT potency test, namely a cell-based potency assay ("CBPA") where potency is measured *in vitro* at the cellular level.  In 2011, Allergan became the first company to receive FDA approval for the use of a CBPA as an alternative potency testing method in connection with releasing drug product lots.  Allergan's CBPA technologies, such as the critical reagents used with the assay,

standard operative procedures, protocols, and data, are highly confidential and proprietary trade secrets.

32. Allergan takes significant precautions to ensure the confidentiality of its trade secrets, including its proprietary characterization, Botox Reference Standard, and CBPA technologies.

## II. Allergan's Trade Secrets, Their Value, and Allergan's Efforts to Maintain Its Trade Secrets as Confidential and Proprietary

33. Allergan and its predecessors have expended substantial time, labor, and money to research and develop business, regulatory, and technical trade secrets concerning Botox and Juvéderm that have significant value, are not publicly known or readily ascertainable, and that Allergan maintains as confidential and proprietary information (individually and collectively referred to herein as the "Allergan Trade Secrets").

34. The Allergan Trade Secrets include, for example: (i) characterization data concerning the Botox drug substance; (ii) the Botox Reference Standard; (iii) the critical reagents, standard operating procedures, protocols, and data associated with Allergan's CBPA technologies; (iv) Allergan's strategies and techniques to manufacture Botox, such as those described in confidential Botox regulatory filings relating to cell banks, upstream and downstream processes, storage conditions, finish-and-fill steps, and related data; (v) regulatory strategies and best practices; (vi) data regarding Allergan's customers for Botox and/or Juvéderm, including market data, preferences, contacts, buying history, confidential sales representative success rates, territories, identities, and related information; (vii) marketing strategies for Botox and Juvéderm; (viii) Allergan's past, current, and future commercial and regulatory plans concerning Botox and/or Juvéderm; and (ix) strategies to compete in the marketplace, including against Revance's Daxxify and RHA products.

9

35.     The Allergan Trade Secrets include, but are not limited to, confidential and proprietary data, information, files, documents, know-how, and negative know-how.

36.     Allergan currently has and has had legal and equitable title to and/or a license to the Allergan Trade Secrets for all times relevant to the acts alleged herein, and a right to sue for misappropriation of those trade secrets.  Allergan is also in lawful possession of Allergan Trade Secrets and has been for all times relevant to the acts alleged herein.

37.     The Allergan Trade Secrets derive independent economic value (both actual and potential) from not being generally known to, and not being readily ascertainable through proper means by, others who can obtain economic value from the disclosure or use of the Allergan Trade Secrets.  Although Allergan has patents and scientists have authored publications concerning Botox and/or Juvéderm, this publicly available information does not disclose the Allergan Trade Secrets.  The Allergan Trade Secrets are the result of valuable research and development, time, effort, and investment and have remained confidential at all times.

38.     The Allergan Trade Secrets would be valuable to competitors because they, among other benefits, demonstrate various proofs of concept, steer competitors away from paths that are not fruitful, and speed research and development.  For example, the Allergan Trade Secrets would be valuable to a competitor seeking to shorten the amount of time needed to manufacture, characterize, or determine the potency of a BoNT drug substance or drug product lot.  A competitor developing a Botox biosimilar would also benefit from understanding the reference product drug profile to target.  The Allergan Trade Secrets would also be valuable to a competitor seeking to market and sell competing products and shorten the amount of time needed to obtain market share.

39.     Allergan maintains stringent security measures to preserve the secrecy of Allergan Trade Secrets.  This strict scrutiny is particularly important in light of the considerable investment Allergan has made in developing and curating the Allergan Trade Secrets.  For example, Allergan has, and at all times relevant to this matter had, written policies and procedures governing its information technology ("IT") and the security of confidential information, including the Allergan Trade Secrets.  Allergan's policies and procedures relate to computer controls, data access, IT disaster recovery, network security, user setup procedures, password administration and management, data backup, security audits, security breach investigations, email best practices, and mobile device security.

40.     Allergan requires employees to adhere to strict rules and policies regarding its confidential information, including that no Allergan Trade Secrets, or other confidential or proprietary information, may be disclosed to any unauthorized third party.

41.     Allergan limits access to the Allergan Trade Secrets to certain employees and stores Allergan Trade Secrets electronically in a secure network system.  Allergan routinely audits user access to critical shared folders, and each critical function stakeholder must approve the list of personnel with access.  Allergan's computers are protected from unauthorized access through the use of individual user names and passwords, and passwords must be regularly changed.  Allergan's electronic applications require user authentication and also have a session timeout mechanism in place.  Accessing the Allergan network using a personal computer is allowed upon receiving approval of a written request that must be submitted to Allergan security and information technology professionals.  Personal computers allowed to connect to the Allergan network must satisfy the company's standard computer security practices and are subject to inspection and monitoring by Allergan.

42.     Allergan protects the Allergan Trade Secrets from disclosure in its business dealings with third parties through nondisclosure agreements.

43.     Within its facilities, Allergan restricts building access for areas containing sensitive information, including areas containing the Allergan Trade Secrets.  Access to these areas requires multi-door permissions that are only granted if an individual's job duties require access to these areas.  Additionally, to access certain Allergan Trade Secrets, employees with the requisite clearance must not only swipe their badge through multiple doors, but also enter a unique four-digit pin code.  Access to Allergan's server rooms is limited to IT and facilities staff who have been granted access by security professionals, and the list of people who have access is reviewed on a regular basis.

44.     To ensure the security of Allergan Trade Secrets, Allergan has licensed encryption software that monitors application and data usage, encrypts sensitive data, and enables auditing for compliance with Allergan's security policies.

45.     Exemplifying Allergan's security measures, Allergan employees received training on the company's Code of Business Conduct, which, *inter alia*, states:

> We are especially careful to protect proprietary information—
> knowledge that AbbVie owns and uses to our competitive advantage
> in the marketplace, such as trade secrets, manufacturing processes,
> and business methods.  Confidential, proprietary information is used
> only to do our jobs; we never share it with anyone, inside or outside
> of AbbVie, who is not authorized to see or hear it.

46.     Allergan employees are also bound by a duty of loyalty to the company:  they are obligated to serve only Allergan during their employment and to act in the company's best interests.  No agent or employee of Allergan who has been entrusted in the course of employment with valuable Allergan Trade Secrets known only to Allergan, may thereafter utilize this secret knowledge against the interests or to the prejudice of Allergan.

III.    **Revance's Rush to Enter the BoNT and Dermal Fillers Market**

47.    In contrast to Allergan, Revance has little to no experience in developing a successful BoNT pharmaceutical franchise, let alone one with Botox's laudable track record. Nor has Revance ever developed a dermal filler line of product that has achieved the commercial success of Juvéderm.

48.    Founded in 1999 under the name "Essentia Biosystems, Inc.," Revance initially marketed itself as an emerging company with a transdermal delivery system that could transport macromolecules, such as BoNT, across human skin. Relying on that approach, Revance tried to bring to market a topical BoNT formulation product called "RT001." But following years replete with failed manufacturing and clinical development efforts and no FDA approval, Revance discontinued its RT001 project in 2016.

A.    **Daxxify**

49.    With the failure of its topical BoNT product, Revance shifted its focus in the 2016-17 timeframe to another product in its pipeline—"RT002," an injectable BoNT formulation that, if approved, would compete directly with Allergan's Botox. RT002 has also been referred to as "DaxibotulinumtoxinA for Injection."

50.    On September 8, 2022, Revance announced FDA approval of its Biologics License Application ("BLA") for RT002, to be marketed and sold under the trade name Daxxify (DaxibotulinumtoxinA-lanm), for improvement in the appearance of moderate to severe glabellar lines. Revance is also pursuing a supplemental BLA for Daxxify (DaxibotulinumtoxinA-lanm) for the treatment of cervical dystonia, which the FDA will likely decide on whether to approve by August 2023. Regulatory efforts for approval of Daxxify outside the United States are also underway by Revance. Revance also recently announced, on April 19, 2023, that the FDA has approved a third party contract manufacturer.

13

51.     Public documents state that Revance obtained approval of Daxxify by relying on the LD50 mouse lethality test to determine potency.  (*See, e.g.*, Ex. A, BLA 761127 Product Quality Review at 12 (Aug. 31, 2022) (stating that Daxxify's "[p]otency is expressed in LD50 units, with one unit of activity defined as the amount of drug required to kill 50% of the animals. For [drug product], potency is reported relative to the [drug product] reference standard.  The potency assay is the same as described in the [drug substance] section of this review memo.").)

52.     Revance, like Allergan before it, is seeking FDA approval for an alternative potency assay to the LD50 mouse lethality test.  Public FDA documents state that Revance has made a post-marketing commitment with the FDA "[t]o develop, validate, and implement an appropriate cell-based potency assay to replace the current *in vivo* mouse LD50 potency assay for the release and stability testing of daxibotulinumtoxinA drug substance and drug product." (*See, e.g.*, Ex. A, BLA 761127 Product Quality Review at 6 (Aug. 31, 2022); Ex. B, BLA 761127 Approval Letter at 3 (Sept. 7, 2022).)

53.     On January 1, 2021, Revance established its corporate headquarters in Nashville. Revance requires that any practitioners administering Daxxify travel to its Nashville headquarters to receive training on its product.  (*See* Podcast, *The Technology of Beauty*, Interview with Dustin Sjuts at 33:56-35:02 (Revance President Dustin Sjuts confirming "injectors" must visit the Nashville facility to train on Daxxify's purported "clinical benefits and formulation.") (Apr. 3, 2023), *available at* https://www.youtube.com/watch?v=Cn-2dV5OpTo).

### B.     Botox Biosimilar

54.     In parallel with its RT002 development, and beginning in February 2018, Revance has pursued a collaboration with Viatris, Inc. (f/k/a Mylan N.V.) to develop a biosimilar of Allergan's Botox product.

55.     In February 2019, Revance and Viatris held a "Biosimilar Initial Advisory Meeting" with the FDA to discuss their proposed Botox biosimilar product, during which the FDA provided insights on its expectations for a development program attempting to show biosimilarity to Botox.  But it was not until recent months—following the poaching of numerous former Allergan employees—that Revance has reportedly made regulatory headway for its proposed biosimilar.

56.     Revance and Viatris claim they are currently in the process of conducting studies as part of an Investigational New Drug application, and that they anticipate launching a Botox biosimilar in 2026.  (*See, e.g.*, Viatris, Inc., Investor Presentation (Feb. 27, 2023).)

57.     By way of brief background, the Biologics Price Competition and Innovation Act of 2009 ("BPCIA") governs the approval of a type of drug called a "biosimilar."  To obtain approval through the BPCIA's abbreviated process, the manufacturer of a biosimilar may attempt to rely on certain data showing a previously licensed biologic to be safe, pure, and potent.  Specifically, a biosimilar manufacturer must show that its proposed product is "highly similar" to the already-licensed biologic product[1] and that there are no "clinically meaningful differences" between the two products in terms of "safety, purity, and potency."  42 U.S.C. § 262.

58.     Pursuit of a biosimilar product through the BPCIA's abbreviated regulatory pathway can be lucrative.  The general idea is that, assuming the appropriate regulatory approvals and other requirements have been satisfied, the biosimilar applicant may—assuming it

---

[1] Biologics are complex proteins manufactured in living cells rather than by chemical synthesis. The manufacture, characterization, and clinical study of these protein-based biologic medicines—*e.g.*, antibodies and toxins, like Botox—are intricate endeavors.

can make the requisite biosimilarity showing—be able to enter the market with the benefit of not having to run clinical trials to establish efficacy in each and every indication for which the originator product is approved. This is because, according to the FDA, an approved biosimilar has the same safety and effectiveness over the course of treatment as the original reference product. Thus, Revance has a powerful motivation to try to take advantage of Allergan's efforts to obtain approval for Botox's many therapeutic and aesthetic indications.

59.     To obtain biosimilar approval under the BPCIA, an applicant typically approaches the FDA with characterization-related information about the referenced biologic product and explains why it believes the proposed product is "highly similar" under the applicable laws and regulations. That characterization work may include information about molecular structure, potency, and other key information.

60.     Characterizing a botulinum toxin product is unlike characterizing any other product in the market. Elucidating the structure of the drug substance in a BoNT product, for example, can be extraordinarily difficult. With respect to potency, each company that markets a BoNT product also uses its own unique, proprietary reference standard. In the case of Allergan, the trade secret-protected information concerning Botox characterization and potency is highly valuable and maintained under strict confidentiality.

61.     While the BPCIA outlines an abbreviated pathway for biosimilar approval, it does **not** give a company like Revance license to misappropriate Allergan Trade Secrets, including, for example, information related to Botox characterization, the Botox Reference Standard, the CBPA assay, or Allergan's manufacturing and regulatory strategies. Yet, as discussed herein, Revance has done just that.

62.     It is widely acknowledged in the field that the approval of any toxin biosimilar would be unprecedented, including based on the complexities in characterizing the drug product given that each product is defined by unique potency units. The FDA has never approved, or even accepted for filing, a biosimilar application referencing Botox or any other licensed toxin.

63.     Moreover, when approving or rejecting a biological medicine for commercial sale, regulatory agencies do more than consider the ultimate molecules produced—they also enforce rigorous quality standards throughout the manufacturing process. Regulatory authorities demand that producers adhere to sound manufacturing practices that ensure biopharmaceuticals are consistently produced with the quality, safety, and effectiveness necessary for use in humans. This, of course, applies to applicants that have their own manufacturing facilities, as well as companies with which they may contract to provide manufacturing services. Developing manufacturing processes and specifications to satisfy appropriate standards is a critical undertaking for any biopharmaceutical company, and an expensive and demanding process.

64.     Revance significantly benefits from having access to the Allergan Trade Secrets, including those related to manufacturing processes, standard operating procedures, best practices, and validation, in pursuing a Botox biosimilar product.

65.     Saving time, resources, and effort is extremely valuable for biosimilar manufacturers, since getting to market as quickly as possible is a key commercial goal and translates to potentially hundreds of millions of dollars in increased product sales revenue and market share.

**C.     The Resilient Hyaluronic Acid ("RHA") Dermal Fillers Collection**

66.     In addition to its injectable BoNT product, Revance attempted to copy Allergan's business model again in 2020 by launching a line of dermal filler products, namely RHA 2, RHA

3, RHA 4, and RHA Redensity (collectively, "the RHA Collection"). Revance's RHA dermal filler products compete directly with Allergan's Juvéderm products.

67. Unlike Allergan, Revance has not brought the RHA Collection to market due to any of its own technical prowess. Rather, Revance in-licensed its RHA Collection from a third party, Teoxane SA.

68. Typically, the sales and marketing efforts for filler and neuromodulator products such as Juvéderm and Botox (or the RHA Collection and Daxxify) are closely aligned due to the overlap in sales force, customers, and marketing initiatives, explaining why Revance targeted Allergan employees with access to both technical and business Allergan Trade Secrets. Many aspects of marketing BoNT injectable products for aesthetic use apply to dermal fillers, and vice-versa, and having access to Allergan's business trade secrets concerning Botox and Juvéderm would greatly accelerate Revance's marketing of both RHA and Daxxify.

## IV. Revance's Misappropriation of Allergan Trade Secrets

### A. Revance's Empty Promises to Allergan

69. Allergan and Revance have a history. Over a number of years, Revance unsuccessfully sought to persuade Allergan to enter into a commercial collaboration to market BoNT products, including Revance's hoped-for topical formulation.

70. With failures racking up, and increasing pressure to make something of RT002 and its biosimilar collaboration, Revance sought to bolster its standing in the BoNT market. A number of press releases announcing that Revance had hired former Allergan employees with Botox experience soon followed.

71. On April 11, 2019, Allergan's then-Chief Legal Officer and Corporate Secretary, Mr. Bob Bailey, sent a letter to Revance's then-Chief Executive Officer, Dan Browne. Allergan's letter reminded Revance of its obligations not to "directly or indirectly, use or rely

18

upon any confidential, proprietary and/or trade secret information that belongs exclusively to Allergan as part of Revance's development of a purported 'biosimilar' to Allergan's [Botox products] or advancement of its RT002 program." (A. Bailey Ltr. to D. Browne (Apr. 11, 2019).)

72. Revance responded on April 25, 2019, seeking to assuage Allergan's concerns through clear assurances: "We are aware that former Allergan employees hired by Revance may have continuing obligations not to use or disclose confidential or proprietary information belonging to their former employers, including Allergan. We have no intention of misappropriating any such information." Revance represented that it takes "thorough steps to ensure that [its] employees are advised, at the time of their hiring, about their obligations to refrain from unauthorized disclosure or use of proprietary information belonging to former employers." (C. McDowell Ltr. to A. Bailey (Apr. 25, 2019).)

73. At the time Allergan and Revance exchanged these letters, Revance had no BoNT products on the market, and had not yet obtained regulatory approval for RT002. There was also no suggestion that its biosimilar collaboration with Viatris had made any meaningful clinical progress. Revance also had not yet in-licensed the RHA Collection.

**B.      Poaching of Key Allergan Employees Lays the Foundation for Revance to Misappropriate the Allergan Trade Secrets**

74. Revance's promise to take thorough steps to ensure that its employees refrained from unauthorized disclosure or use of Allergan's proprietary information turned out to be empty.

75. Instead, Revance has engaged in a concerted pattern and practice of filling its ranks with individuals who have intimate knowledge of the Allergan Trade Secrets, including in

the areas of research and development, manufacture, medical affairs, regulatory approval, marketing and sales, and legal.

76. ***Numerous former Allergan employees have been hired by Revance.*** Many former Allergan employees joined Revance directly after leaving Allergan. And notably, many of those former Allergan employees joined around the time Revance abandoned its topical product RT001, and shifted its focus to Daxxify and a Botox biosimilar to compete directly with Allergan's Botox products, as well as to the RHA Collection to compete with Allergan's Juvéderm portfolio.

77. Revance has described its poaching of Allergan employees as a path to help build Revance into the next major player in the neurotoxin field.

78. Revance appointed Mr. Julian Gangolli, Allergan's previous President of North American Pharmaceutical Division, to the Board and as a member of the Audit Committee. (*See* Revance Therapeutics, Inc., Press Release (July 5, 2016).) Revance's then-President and Chief Executive Officer touted Mr. Gangolli's "direct involvement in the extraordinary growth of the botulinum toxin market," and expressed that he would "be invaluable as we continue to progress toward regulatory approval and commercialization of RT002 . . . ." (*Id.*)

79. Revance also has touted the Allergan roots of three current Revance C-suite level executives. (*See* Revance Therapeutics, Inc., Press Release (Oct. 17, 2022) (announcing Chief Medical Officer David Hollander as a key player to advance Revance's "efforts in its aesthetics commercial launch, international regulatory strategy, therapeutics opportunity, and the biosimilar to Botox program," and emphasizing his career experience at Allergan); Revance Therapeutics, Inc., Form 8-K (Nov. 9, 2021) (announcing the promotion of Dustin Sjuts to President, and highlighting his leadership experience in the aesthetics market and Allergan

experience); *see also* Revance Therapeutics, Inc., Press Release (Feb. 24, 2020) (announcing former Allergan in-house attorney Dwight Moxie as Senior Vice President, General Counsel and Corporate Secretary).)

80.     When Revance announced the appointment of Ms. Taryn Conway, "a former Allergan marketing veteran," to the role of Vice President of Marketing, Revance made clear that this experience would be leveraged, as she became "an integral architect of product launch strategies and implementation, further enhancing [Revance's] commercial readiness." (*See* Revance Therapeutics, Inc., Press Release (May 8, 2019).)

81.     Revance has directed, recruited, approved, and offered employment packages for certain former Allergan employees via Revance employees who reside in or around the company's corporate headquarters in Nashville.  Moreover, Revance's Nashville recruiters have contacted current Allergan employees in furtherance of the company's predatory poaching campaign, including through unprompted LinkedIn messages.

## C.     Allergan Verifies Its Growing Suspicion That Revance Misappropriated Its Trade Secrets

82.     Revance's overall scheme was not immediately apparent.  Revance built its team over time, while providing assurances to Allergan that it was taking thorough steps to ensure that its employees were advised about their obligations to refrain from unauthorized disclosure or use of proprietary information from prior employers.

### *Jennifer Aggabao*

83.     Revance's scheme was exposed following a disclosure Revance made in a court filing in 2023 about one of Allergan's former employees, Jennifer Aggabao.

84.     While employed by Allergan, Jennifer Aggabao held the title Director, Global Regulatory Affairs, Chemistry Manufacturing and Controls ("CMC") Biologics.  In this role,

Ms. Aggabao spearheaded efforts with regulatory agencies around the world that implicated Allergan Trade Secrets related to regulatory strategies and manufacturing, including issues concerning Allergan's proprietary Botox Reference Standard and CBPA technology. Ms. Aggabao was also in possession of highly sensitive information concerning Allergan's current and future regulatory and commercial launch plans concerning Botox.

85.     In October 2021, Allergan filed suit against Revance alleging patent infringement. *See Allergan, Inc. et al. v. Revance Therapeutics, Inc. et al.*, C.A. No. 21-1411 (D. Del. filed on Oct. 1, 2021) ("the patent case").  During the course of that litigation, on January 30, 2023, a public declaration was filed by Ms. Aggabao, who stated:

> I have been employed by Revance since August 29, 2022.  I am currently Sr. Director, Regulatory Affairs, CMC at Revance, and my responsibilities in that role include:  leading and managing the drafting, review, and compilation of CMC component of global regulatory submissions, including investigational new drug applications, Biologics License Applications (BLA), and other global submission documents, and interacting with global regulatory agencies on defined matters.

(*See, e.g.*, Ex. C, *Allergan, Inc. et al. v. Revance Therapeutics, Inc. et al.*, C.A. No. 21-1411, D.I. 96 ¶ 2 (D. Del. Jan. 30, 2023).)

86.     As Revance's Senior Director, Regulatory Affairs, CMC with responsibilities over Daxxify regulatory filings and Botox biosimilar efforts, Ms. Aggabao's role at Revance is consistent with her responsibilities at Allergan.  Indeed, Ms. Aggabao is still working on BoNT-related regulatory initiatives—but now it is for a competitor managing regulatory filings related to Daxxify manufacturing and a copycat biosimilar version of Botox.  Indeed, when Revance and Ms. Aggabao were in communication about her new job, Revance was in the final stages of receiving FDA approval on Daxxify.  Ms. Aggabao began working at Revance in time for her to lead the way on the company's global expansion of Daxxify and approval for

additional contract manufacturers, as well as Revance's commitment to the FDA to seek approval for an alternative CBPA. In this capacity, Ms. Aggabao and Revance would certainly benefit from their improper use of Allergan Trade Secrets.

87. Following Revance's disclosure of Ms. Aggabao's duties and responsibilities on January 30, 2023, a pattern of trade secret misappropriation for Revance's benefit was revealed, and Revance's willful, repeated, and ongoing scheme to target and hire Allergan employees to obtain Allergan Trade Secrets confirmed.

88. When Ms. Aggabao resigned from Allergan, she refused to disclose her next employer, all while still having access to Allergan Trade Secrets. In the days and weeks leading up to her resignation and final day of Allergan employment, Ms. Aggabao accessed, received, reviewed, and downloaded Allergan Trade Secrets—something she would not have been permitted to do if Allergan knew that she had accepted an offer of employment with Revance.

89. From the middle of July 2022 (when Revance offered Ms. Aggabao a position there) until August 26, 2022 (her final day of employment at Allergan), Jennifer Aggabao accessed and downloaded a wide array of documents containing Allergan Trade Secrets maintained securely in Allergan files.

90. The graphic below reflects Ms. Aggabao's data activity, which spiked dramatically, both in volume and timing, in a manner inconsistent with her prior job performance. The axis on the bottom reflects time, namely the weeks and months before Ms. Aggabao departed Allergan. The axis on the left corresponds to the number of activity events. The various vertical bars reflect specific types of activity, such as "FileAccessed" in green.



91.     Ms. Aggabao's flurry of activity involved not only previewing and accessing, but also downloading (an action which was unnecessary in the scope of her duties) documents containing Allergan Trade Secrets.  The forensic evidence shows that Ms. Aggabao was in contact with Revance about joining that company in or around the middle of July.  During this time, her access and/or downloads included Allergan Trade Secrets, such as confidential information on internal best practices used by Allergan regulatory professionals to ensure consistency with manufacturing-related submissions to agencies, manufacturing information, and Botox drug substance characterization analysis and potency information related to, *inter alia*, reference standard protocols, CBPA procedures and critical reagents, validation techniques, and stability data.  Allergan understands that some or all of this information was accessed and/or downloaded for the benefit of Revance, which would undoubtedly benefit from its use and is currently in the possession, custody, or control of Revance.

Case 3:23-cv-00431   Document 1   Filed 04/28/23   Page 24 of 38 PageID #: 24

92.     The forensic evidence reveals that Revance most likely offered Ms. Aggabao a new employment position around the week of July 11, 2022. For example, Ms. Aggabao's internet searches for that week reveal that she intended to accept the offer to work with Revance. On July 19, 2022, Ms. Aggabao searched "how do you thank someone for a job offer?" on Google. On July 21, 2022, Ms. Aggabao Google searched: "resignation letter example."

93.     However, Ms. Aggabao waited at least two additional weeks (until August 5, 2022) before she decided to inform Allergan that she planned to leave the company. During this time, the investigation revealed Ms. Aggabao's unusual activity with Allergan Trade Secrets.

94.     On or about August 5, 2022, Ms. Aggabao orally informed her superior that she intended to resign, as she had received and verbally accepted an offer from another company. But when asked to share details, Ms. Aggabao refused to say where she would be working.

95.     In the days following the discussion with her superior, Allergan explored potential options to retain Ms. Aggabao as an employee. Those efforts, however, were ultimately insufficient to persuade Ms. Aggabao, as she informed Allergan that the unknown company (now known to have been Revance) offered her an abnormally attractive recruitment package that included a 50% pay increase, an Executive Director title, bonus pay, and matching restricted stock units.

96.     On or about August 9, 2022, Ms. Aggabao provided written notice of resignation from Allergan, stating that her last day would be August 26, 2022.

97.     On August 24, 2022, Ms. Aggabao's team hosted a farewell lunch for her. Ms. Aggabao was asked whether she was going to work for Revance. Instead of telling the truth, Ms. Aggabao deflected.

98.     Despite multiple requests, at no point before her final day of employment on August 26, 2022 did Ms. Aggabao inform Allergan management that her next employer was Revance, a company whose entire toxin portfolio is structured to compete with Botox.  Ms. Aggabao's colleagues, several of whom had worked with Ms. Aggabao for six years, trusted that she would not go to Revance without letting them know, particularly in light of the sensitivity of her position within the company.  As a result, Ms. Aggabao was able to continue to access Allergan Trade Secrets that related directly to her new position at Revance, information which would have been cutoff immediately by Allergan had she been honest and forthright.  Not until a final conversation with a superior late in the afternoon *after* departing the building on her final day did she reveal that her next employer was Revance.

99.     Ms. Aggabao started working at Revance just two days later after having accessed extremely sensitive documents containing Allergan Trade Secrets.

100.    Revance placed Ms. Aggabao into a position where the Allergan Trade Secrets would be critical.  She led and managed the drafting, review, and compilation of CMC components of global regulatory submissions, including investigational new drug applications, biologics license applications, and other global submission documents, as well as interactions with global regulatory agencies on defined matters.

101.    Given Ms. Aggabao's activities prior to her departure, it is clear that Revance has misappropriated Allergan Trade Secrets through Ms. Aggabao due to her intimate knowledge and possession of information describing Allergan Trade Secrets.  To do so, Revance offered a 50% wage increase, a significant title promotion, bonus pay, and company stock.

*Cara Chastain*

102.    Revance's scheme was not limited to Ms. Aggabao.  Cara Chastain is another former Allergan employee who now works at Revance.

103.    While employed by Allergan, Ms. Chastain held the title Executive Director, Facial Aesthetics Marketing.  In this role, Ms. Chastain worked on Botox and Juvéderm marketing efforts implicating Allergan Trade Secrets, including issues involving competitive intelligence related to Revance.

104.    On or around August 5, 2021, Ms. Chastain notified Allergan that she intended to leave the company.  When asked by Allergan whether she had another job lined up, Ms. Chastain falsely stated that she did not.  The truth, as revealed 24 hours later, was that Ms. Chastain already had accepted a position with Revance and was moving to Nashville.  When Allergan learned of that employment, she was immediately escorted off the premises.

105.    Ms. Chastain's actions in the time before her employment ended speak volumes.

106.    Before Allergan learned that Ms. Chastain had accepted a position at Revance, she sought access from a Botox marketing team member to Allergan Trade Secrets, including confidential competitive strategies in response to Revance's then-pending Daxxify product. Ms. Chastain's request to access this information was made under the false pretense that it was needed to perform her job duties at Allergan.  In addition, after falsely stating she did not have another position, she attended a confidential and trade secret, financial strategy meeting to discuss Allergan information and financial forecasts for Botox and Juvéderm, and competitive intelligence regarding toxins and fillers.

107.    Immediately after Ms. Chastain was escorted off the premises, Allergan sent her a letter, copying Revance's General Counsel, Dwight Moxie (himself a former Allergan

employee), reiterating her continued obligations to not divulge or use Allergan confidential information.

108.   Neither Ms. Chastain nor Revance responded to that letter.

109.   Ms. Chastain ultimately relocated to Nashville to work for Revance.

### *Wendy Shepherd*

110.   Wendy Shepherd is another former Allergan employee who now works at Revance and is also involved in Revance's improper acquisition of Allergan Trade Secrets.

111.   While employed by Allergan, Ms. Shepherd held the title Senior Business Development Manager.  In this role, Ms. Shepherd worked on Botox and Juvéderm sales efforts involving Allergan Trade Secrets, and had access to highly confidential customer lists and internal sales data.

112.   In or around early January 2023, Ms. Shepherd began to work on her resume in preparation for an interview with Revance, which appears to have occurred on or about February 6, 2023.  Ms. Shepherd's final day of employment at Allergan was February 17, 2023.

113.   In the days and weeks leading to her departure, Ms. Shepherd exfiltrated sensitive Allergan Trade Secrets with the approval of Revance.

114.   The forensics evidence shows that Ms. Shepherd put together a PowerPoint presentation for her interview with Revance containing significant amounts of Allergan Trade Secrets.  Ms. Shepherd saved that document on her work computer, and used her work email address to send the information to her personal Gmail account.  The cover slide of the presentation includes Revance's logo and states, "Meet Your Next PAC," with "PAC" meaning "Prestige Aesthetic Consultant."  The following slides contain significant amounts of proprietary information, including a list of Allergan's top sales people with associated sales figures and

geographic locations.  The presentation also provides a screenshot of sales figures for 2022, including those concerning Botox and Juvéderm.  A "30-60-90 Day Business Plan" is also included in the presentation—keys points include "**_Begin to_ _convert_ _Allergan accounts and onboard them_**" and "**_Close business with new customers as well as_ _Allergan_ _accounts_**."  The final slide of the presentation states "When Do I Start?"

115.    Revance offered Ms. Shepherd a position as a "Prestige Aesthetic Consultant" on February 6, 2023, or shortly thereafter.

116.    Given the content of the presentation, Revance made its offer to Ms. Shepherd with full knowledge that Allergan Trade Secrets were misappropriated, and would be used to Revance's benefit.

117.    On February 7, 2023, the day after her apparent interview with Revance, Ms. Shepherd sent multiple confidential documents containing Allergan Trade Secrets from her work email address to her personal Gmail account.  For example, Ms. Shepherd sent an email to her personal account attaching a .zip folder containing highly confidential internal sales tracking, customer lists, action plans, internal frequently asked question strategies, and more.  Each of these items are Allergan Trade Secrets.

118.    On that same day, Ms. Shepherd also sent to her personal account, _inter alia_, pricing calculators for Botox and Juvéderm sales that were not to be reproduced in any form or by any means, business strategy templates, performance reports, and more.  These also are Allergan Trade Secrets.

119.    On February 16, 2023, Ms. Shepherd attempted to purge her work computer, deleting numerous files and folders.

120.     On February 17, 2023, Ms. Shepherd sent a document containing Allergan Trade Secrets, namely a customer email distribution list, from her Allergan email address to her personal Gmail account.

121.     During the month of February 2023, Ms. Shepherd sent multiple megabytes of files to her personal Gmail account.

122.     Even *after* leaving her position at Allergan, Ms. Shepherd used her Allergan issued email account to communicate with customers.  On February 18, 2023, Ms. Shepherd, in the final moments before email access was cut off, informed a client of her resignation from Allergan, and promised:  "I'll still be in aesthetics and I'm sure you'll see me! Take care!"

123.     While investigation is ongoing, it has revealed a coordinated plan by Revance to target Allergan employees who can access and leverage the Allergan Trade Secrets in their new positions for the benefit of Revance.  There is a pattern:  Revance recruits Allergan employees who, after interviewing and/or receiving offers, show a spike in computer access activity that is inconsistent with their respective job duties in terms of both volume and timing.  In addition to the examples cited above, forensic evidence shows other employees who were recruited by Revance and then uploaded Allergan's confidential information to a personal cloud account, sent Allergan confidential information to personal email accounts, or downloaded Allergan Trade Secrets.

124.     Revance intentionally placed Jennifer Aggabao, Cara Chastain, Wendy Shepherd and other former Allergan employees into positions consistent with their prior responsibilities at Allergan, ensuring that Revance would benefit from Allergan Trade Secrets.

## V. Allergan Has Been, And Will Be, Severely Harmed by Revance's Misappropriation of Allergan Trade Secrets

125.     Allergan developed the Allergan Trade Secrets at great expense, and through years of painstaking research, experimentation, and effort.  If Revance is not enjoined from its misappropriation, Allergan will suffer severe and irreparable harm.

126.     Recent developments have shed light on its faster-than expected progress in the development and launch of competing products.  Revance's recent progress on the regulatory front for competing products could have occurred only under the supervision and guidance of Allergan's former employees.

127.     Revance's unlawful scheme to misappropriate Allergan Trade Secrets is yielding, *inter alia*, the benefits of accelerated efforts to obtain FDA approval for an alternative CBPA, approval for an additional manufacturing site, and worldwide expansion, as well as a more rapid commercial entry for Daxxify and the RHA Collection.  Furthermore, Revance's efforts to obtain approval for its Botox biosimilar are benefiting from Revance's misappropriation of highly confidential information concerning Botox characterization, potency determination strategy, and other regulatory-related efforts.  The potency-determination strategies, including through the post-approval supplement to obtain approval of an alternative CPBA, that Revance is pursuing with respect to Daxxify will also be used to seek approval for Revance's Botox biosimilar.

128.     Given the direct overlap between the prior responsibilities of former Allergan employees and their positions now at Revance, Allergan understands that Revance will continue to misappropriate Allergan Trade Secrets.

## COUNT I:  MISAPPROPRIATION OF TRADE SECRETS UNDER DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836(B))

129.     Allergan incorporates the allegations contained in the above paragraphs of this Complaint as if fully set forth herein.

31

130.    Allergan has an advantage over its existing and would-be competitors based, in part, on the trade secret information it has developed and implemented in its business efforts.

131.    Allergan owns and possesses certain confidential, proprietary and trade secret information as alleged above.  Allergan has made reasonable efforts under the circumstances to preserve the confidentiality of the Allergan Trade Secrets.

132.    The Allergan Trade Secrets relate to products sold and services used, sold, shipped and/or ordered in, or intended to be used, sold, shipped, and/or ordered in, interstate or foreign commerce.

133.    The Allergan Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from their disclosure or use.  Accordingly, the above-described information constitutes "trade secrets," under the Defend Trade Secrets Act, 18 U.S.C. § 1839, *et seq.*

134.    Allergan's former and current employees are under a duty to keep Allergan Trade Secrets secret and not to use or disclose such information other than for the benefit of Allergan.  In taking Allergan Trade Secrets from Allergan, after accepting an offer of employment from Revance, Allergan's former employees improperly acquired and used such information under circumstances giving rise to a breach of duty to maintain secrecy for the benefit of Revance.

135.    Revance induced the breaches of duty by Allergan's former employees in order to gain access to the Allergan Trade Secrets and use those secrets to advantage Revance's business.  Revance knew or at least had reason to know that it acquired and used the Allergan Trade Secrets by improper means.

136. Revance has taken and retained the Allergan Trade Secrets in an unauthorized fashion.

137. Revance has used and/or intends to use Allergan Trade Secrets to its own benefit and to Allergan's detriment without the express or implied consent of Allergan.

138. As a direct and proximate result of Revance's conduct, Allergan has suffered and, if Revance's conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial. Because Allergan's remedy at law is inadequate, Allergan seeks, in addition to damages, permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests. Allergan's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

139. Allergan has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

### COUNT II: MISAPPROPRIATION OF TRADE SECRETS UNDER TENNESSEE UNIFORM TRADE SECRETS ACT (TENN. CODE ANN. § 47-25-1701 *et seq.*)

140. Allergan incorporates the allegations contained in the above paragraphs of this Complaint as if fully set forth herein.

141. Allergan has an advantage over its existing and would-be competitors based, in part, on the trade secret information it has developed and implemented in its business efforts.

142. Allergan owns and possesses certain confidential, proprietary and trade secret information as alleged above. Allergan has made reasonable efforts under the circumstances to preserve the confidentiality of the Allergan Trade Secrets.

143. The Allergan Trade Secrets relate to products sold and services used, sold, shipped and/or ordered in, or intended to be used, sold, shipped, and/or ordered in, interstate or foreign commerce.

144. The Allergan Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from their disclosure or use. Accordingly, the above-described information constitutes "trade secrets," under the Tennessee Uniform Trade Secrets Act, Tenn. Code Ann. § 47-25-1701, *et seq.*

145. Allergan's former and current employees are under a duty to keep Allergan Trade Secrets secret and not to use or disclose such information other than for the benefit of Allergan. In taking Allergan Trade Secrets from Allergan, after accepting an offer of employment from Revance, Allergan's former employees improperly acquired and used such information under circumstances giving rise to a breach of duty to maintain secrecy for the benefit of Revance.

146. Revance induced the breaches of duty by Allergan's former employees in order to gain access to the Allergan Trade Secrets and use those secrets to advantage Revance's business. Revance knew or at least had reason to know that it acquired and used the Allergan Trade Secrets by improper means.

147. Revance has taken and retained the Allergan Trade Secrets in an unauthorized fashion.

148. Revance has used and/or intends to use Allergan Trade Secrets to its own benefits and to Allergan's detriment without the express or implied consent of Allergan.

149. As a direct and proximate result of Revance's conduct, Allergan has suffered and, if Revance's conduct is not stopped, will continue to suffer, severe competitive harm, irreparable

34

injury, and significant damages, in an amount to be proven at trial. Because Allergan's remedy at law is inadequate, Allergan seeks, in addition to damages, permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests. Allergan's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

150. Allergan has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

## JURY DEMAND

151. Pursuant to Federal Rule of Civil Procedure 38(b), Allergan hereby demands a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

Allergan respectfully prays for the following relief:

A. Declaration that Revance has no rights or privileges to use Allergan Trade Secrets;

B. For a judgment in Allergan's favor and against Revance on all causes of action alleged herein;

C. Award permanent injunctive relief pursuant to which Revance and all affiliates, employees, agents, officers, directors, attorneys, successors, and assigns, and all those acting on behalf of or in active concert or participation with any of them are ordered, enjoined, or restrained, directly or indirectly, anywhere in the world, by any means whatsoever as follows:

    i. from possessing, disclosing and/or using Allergan Trade Secrets;

    ii. from making, testing, using, promoting, offering to sell, marketing, commercializing, or selling biosimilars, therapeutics, drugs, and/or products of any kind

that are derived from, utilize, contain, embody, or were developed, in whole or in part, with the benefit or use of any Allergan Trade Secrets;

iii.      from utilizing any processes or methods that are derived from, contain, utilize, embody, or were developed, in whole or in part, with the benefit or use of any Allergan Trade Secrets;

iv.      from submitting or filing with any regulatory body any documents or other materials (in paper, electronic, or any other form, including for example, information derived from the proprietary characterization of Botox, the Botox Reference Standard, and CBPA technologies, and related standard operating procedures and protocols, and potency determination techniques) that are derived from, utilize, contain, embody, or were developed, in whole or in part, with the benefit or use of any Allergan Trade Secrets;

v.      immediately to preserve and prevent from altering, destroying, or disposing of any evidence, in any form, relating to this action, including without limitation emails and paper and electronic documents, including current or archived electronic logs, metadata, and directories;

vi.      immediately to catalog, quarantine, and return to Allergan (i) all Allergan Trade Secrets and (ii) all copies of all documents, information, and materials (in paper, electronic, or any other form, including, for example, information derived from the Botox Reference Standard, and related standard operating procedures and protocols, and potency determination techniques) that are derived from, utilize, contain, embody, or were developed, in whole or in part, with the benefit or use of any Allergan Trade Secrets;

vii.     to identify each individual and entity to whom or to which Revance and its employees and representatives, and all persons acting in concert or participating with them, disclosed (i) any Allergan Trade Secrets and (ii) any documents, information, and materials (in paper, electronic, or any other form, including for example, information derived from the proprietary characterization of Botox, the Botox Reference Standard, and CBPA technologies, and related standard operating procedures and protocols, and potency determination techniques) that are derived from, utilize, contain, embody, or were developed, in whole or in part, with the benefit or use of any Allergan Trade Secrets; and,

viii.     to turn over to the Court any proceeds Revance has received from the misappropriation of Allergan Trade Secrets, which proceeds would be held in constructive trust until the conclusion of this litigation.

D.     Damages in an amount to be determined at trial including compensatory damages, enhanced damages, exemplary damages, punitive damages, and up to the maximum amount permitted by law;

E.     Pre-judgment and post-judgment interest at the rates prescribed by law;

F.     Allergan's reasonable attorney fees and costs;

G.     All other relief at law or in equity, if and to the extent supported by the evidence, to which Allergan may be entitled; and,

H.     Such other and further relief as the Court may deem proper.

\*     \*     \*

CONSTANGY, BROOKS, SMITH & PROPHETE, LLP

*Of Counsel*:

*/s/  William A. Blue, Jr.*

Jennifer Baldocchi
Jarryd Cooper
Lindsey C. Jackson
PAUL HASTINGS LLP
515 South Flower Street,
    Twenty-Fifth Floor
Los Angeles, CA 90071
(*Pro hac vice forthcoming*)

Eric W. Dittmann
Melanie R. Rupert
Carl J. Minniti, III
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(*Pro hac vice forthcoming*)

Jeff A. Pade
James V. Razick
Richard Rothman
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036
(*Pro hac vice forthcoming*)

Andrea Pallios Roberts
PAUL HASTINGS LLP
1117 S. California Avenue
Palo Alto, CA 94304
(*Pro hac vice forthcoming*)

William A. Blue, Jr.
TN Bar No. 10378
CONSTANGY, BROOKS, SMITH & PROPHETE, LLP
750 Old Hickory Blvd., Suite 260-2
Brentwood, TN 37027
(615) 340-3800
zblue@constangy.com

*Attorneys for Plaintiffs*
*Allergan, Inc.,*
*Allergan Pharmaceuticals*
*Ireland Unlimited Company,*
*Allergan USA, Inc., and Allergan Sales, LLC*

Date:  April 28, 2023

38