IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| ALLERGAN, INC. et al., | ) | |
| | ) | |
|    Plaintiffs, | ) | |
| | ) | NO. 3:23-cv-00431 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| REVANCE THERAPEUTICS, INC. | ) | |
| | ) | |
|    Defendant. | ) | |

## **MEMORANDUM OPINION**

Allergan, Inc., Allergan Pharmaceuticals Ireland Unlimited Company, Allergan USA, Inc., and Allergan Sales, LLC (collectively, "Plaintiff") brought this action against Defendant, Revance Therapeutics, Inc., via a two-count complaint. Plaintiff asserted therein claims for misappropriation of trade secrets in violation of the federal Defend Trade Secrets Act (DTSA) (Count I) and the Tennessee Uniform Trade Secrets Act (TUTSA) (Count II). Plaintiff seeks damages as well as declaratory and injunctive relief.

Now pending before the Court is Defendant's Motion to Dismiss (Doc. No. 33, "Motion") seeking the dismissal of Counts I and II. The Motion is supported by a memorandum of law (Doc. No. 34, "Memorandum"). Plaintiff filed a Response in opposition to the Motion (Doc. No. 43, "Response"), and Defendant filed a Reply. (Doc. No. 46).

BACKGROUND

## I.  Facts[1]

### A.  Regulatory Landscape Surrounding Competing Drugs

Plaintiff is a pharmaceutical company that manufactures and sells, among other drugs, botulinum neurotoxin (BoNT) injectable products and dermal fillers. (Doc. No. 1 at ¶¶ 1-2). At issue here are Plaintiff's injectable BoNT product, Botox, and a line of dermal filler products under the trade name Juvéderm. (*Id.* at ¶¶ 23-24). Defendant is a competitor in the BoNT and dermal filler space, and it developed an injectable BoNT product, with the trade name "Daxxify,"[2] to compete directly with Botox. (*Id.* at ¶ 4). Defendant obtained FDA approval for Daxxify in September 2022. (*Id.* at ¶ 50). Shortly thereafter, Defendant began seeking approval to use Daxxify internationally and to expand its regulatory filing to cover new indications.[3] (*Id.*). Moreover, in 2020, Defendant also launched a line of dermal filler products, referred to as the "RHA Collection," which compete directly with Plaintiff's Juvéderm products. (*Id.* at ¶ 66). Defendant also is seeking FDA approval of a Botox biosimilar[4] on which Defendant has collaborated with

---

[1] All (alleged) facts in this section are taken from the Complaint at Doc. No. 1 and, as discussed below, are taken as true for purposes of resolving the pending Motion. Notably, in some places in this section, reference is made not to alleged facts, but to a party's assertions; unlike alleged facts, such assertions are not accepted at true but are included to place the alleged facts in context with the party's competing assertions.

[2] Daxxify is referred to in the Complaint also as "RT002." (Doc. No. 1 at ¶ 4). For the sake of simplicity, the Court uses the term "Daxxify" throughout this memorandum.

[3] Without purporting to state exactly what Plaintiff means when it refers to "indication," the Court understands that generally, an "indication" for a medication is "a valid reason—most often for medical issues such as signs/symptoms or diseases/disorders—to use [the] medication." Sohn S, Liu H., *Analysis of Medication and Indication Occurrences in Clinical Notes*, AMIA Annu Symp Proc. (Nov. 14, 2014).

[4] According to the FDA, a biosimilar is a medication very similar, but not identical, to an original biological medication. https://www.fda.gov/drugs/biosimilars/biosimilar-basics-patients. Biosimilars are made from the same types of sources (e.g., living cells or microorganisms) and are just as safe and effective as the original biologic medication to which they are highly similar. *Id.* To obtain approval through the abbreviated approval process set forth by the Biologics Price Competition and Innovation Act of 2009 ("BPCIA"), "a biosimilar manufacturer must show that its proposed product is 'highly similar' to the

Veatris, Inc. and plans to launch in 2026. (*Id*. at ¶¶ 54, 56). Like Daxxify, Defendant's Botox biosimilar would compete directly with Plaintiff's Botox products. (*Id*. at ¶ 76).

As relevant to its trade secret claims, Plaintiff asserts that its development of confidential know-how concerning BoNT regulatory, technical, and manufacturing efforts has been critical to Botox's success. (*Id*. at ¶ 26). For example, obtaining approval for a BoNT product requires a demonstration of acceptable potency levels of the drug and the drug product. (*Id*. at ¶ 30). In the absence of any international consensus as to a reference potency standard, each manufacturer uses a unique reference standard specific to its own product. (*Id*.). Plaintiff uses its own unique potency reference standard to determine whether manufactured Botox falls within the acceptable potency levels. (*Id*.). This unique reference standard, and all associated procedures, protocols, and data (collectively, the "Botox Reference Standard") are trade secrets.[5] (*Id*.).

The FDA also requires applicants to use a testing-technique (referred to as an "assay") to assess the potency of BoNT products. (*Id*. at ¶¶ 26, 31). Plaintiff was the first company to receive FDA approval for the use of a cell-based potency assay ("CBPA") which measures potency in

---

already-licensed biologic product and that there are no 'clinically meaningful differences' between the two products in terms of 'safety, purity, and potency.'" (Doc. No. 1 at ¶ 57 (quoting 42 U.S.C. § 262)).

[5] The Sixth Circuit has stated that "what constitutes a trade secret is a question of fact." *ECIMOS, LLC v. Carrier Corp*., 971 F.3d 616, 643 (6th Cir. 2020); *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc*., 53 F.4th 368, 381 (6th Cir. 2022) ("Whether a particular type of information constitutes a trade secret is a question of fact."). Even for questions of fact, a court is not required to accept as true "bare assertions," formulaic recitation of the elements, or "conclusory" allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009). In other words, although a question of fact, the Court is not required to accept as true that what Plaintiff calls "Allergan Trade Secrets" indeed qualify as trade secrets in whole or in part under relevant law from a mere assertion by Plaintiff that these items are "trade secrets." However, where a complaint asserts that certain items qualify as trade secrets and supports that assertion with factual matter relating to the criteria used to define trade secrets under the DTSA and TUTSA (as the Complaint does here) the Court must accept that assertion as true. Therefore, for present purposes the Court accepts as true Plaintiff's allegation that the Allergan Trade Secrets, as defined in ¶ 34 of the Complaint, qualify for trade-secret protection under DTSA and TUTSA.

vitro at the cellular level. (*Id.*). Plaintiff's CBPA technologies, including the critical reagents used in the assay, procedures, protocols, and data also are trade secrets.

Botox and Juvéderm's success are largely attributable to sales and marketing strategies, including, but not limited to, customer lists and market analysis, which Plaintiff keep highly confidential. (*Id.* at ¶ 27). In full, Plaintiff's trade secrets include:

> (i) characterization data concerning the Botox drug substance; (ii) the Botox Reference Standard; (iii) the critical reagents, standard operating procedures, protocols, and data associated with Allergan's CBPA technologies; (iv) Allergan's strategies and techniques to manufacture Botox, such as those described in confidential Botox regulatory filings relating to cell banks, upstream and downstream processes, storage conditions, finish-and-fill steps, and related data; (v) regulatory strategies and best practices; (vi) data regarding Allergan's customers for Botox and/or Juvéderm, including market data, preferences, contacts, buying history, confidential sales representative success rates, territories, identities, and related information; (vii) marketing strategies for Botox and Juvéderm; (viii) Allergan's past, current, and future commercial and regulatory plans concerning Botox and/or Juvéderm; and (ix) strategies to compete in the marketplace, including against Revance's Daxxify and RHA products.

(*Id.* at ¶ 34). The above items, which the Complaint refers to, collectively, as "Allergan Trade Secrets," qualify as trade secrets as defined by DTSA and TUTSA. (*Id.*).[6]

Plaintiff has expended substantial time, labor, and money to develop the Allergan Trade Secrets by, for example, conducting extensive research and large-scale clinical trials along with hundreds of sponsored studies to develop and obtain regulatory approval for Botox. (*Id.* at ¶¶ 2, 23, 33). The Allergan Trade Secrets "derive independent economic value (both actual and potential) from not being generally known to, and not being readily ascertainable through proper means by, others who can obtain economic value from the[ir] disclosure or use. (*Id.* at ¶¶ 33, 37). The Allergan Trade Secrets would be valuable to competitors, for example, because they

---

[6] For the reasons set forth above in a footnote, the Court accepts as true all allegations in the Complaint (wherever they appear) that the Allergan Trade Secrets, as defined in ¶ 34 of the Complaint, qualify for trade-secret protection under DTSA and TUTSA.

"demonstrate various proofs of concept, steer competitors away from paths that are not fruitful, and speed research and development." (*Id*. at ¶ 38). Because the Allergan Trade Secrets are not generally known and would be valuable to others, Plaintiff has taken significant precautions to ensure their confidentiality. (*See id*. at ¶¶ 32-33; 39-46). For example, Plaintiff has implemented written policies and procedures governing its information technology such as computer controls, restrictions on data access, network security, security audits, and more. (*Id*. at ¶ 39). Plaintiff has also limited access to the Allergan Trade Secrets to certain employees and requires employees to follow strict rules regarding confidential information, among other protective measures. (*Id*. at ¶¶ 39-46).

B. Recruitment of Allergan Employees by Defendant

Defendant successfully recruited several of Plaintiff's employees (while they were working for Plaintiff), including high level executives, to join Defendant directly after leaving Plaintiff. (*Id*. at ¶¶ 76; 78-81). After Defendant issued a press release announcing that it had hired several former employees of Plaintiff, Plaintiff sent Defendant's then-CEO a letter reminding Defendant of its (alleged)[7] obligations not to "directly or indirectly, use or rely upon any confidential, proprietary, and/or trade secret information that belongs exclusively to [Plaintiff] as part of [Defendant's] development of a purported 'biosimilar' to [Plaintiff's] Botox products . . . ." (*Id*. at ¶¶ 70; 71). Defendant (through a "C. McDowell, whose role at Defendant is not identified in the Complaint) responded, recognizing such (alleged) obligations and stating that it had no intention of

---

[7] The Court here adds "alleged" because Plaintiff's allegation that Defendant had such obligations is an allegation not of fact, but rather of law, to which no presumption of truthfulness attaches. On the other hand, the Court does accept as true Plaintiff's allegation of fact that Defendant's then-CEO conceded (i.e., indicated a belief, though not necessarily a correct belief) that Defendant in fact bore such obligations.

Moreover, Defendant does not contend that the legal contention that it had such obligations is not adequately supported by factual matter alleged in the Complaint or is otherwise meritless. Thus, the Court accepts this contention as true for current purposes.

misappropriating such information. (*Id.* at ¶ 72). Defendant was therefore aware of Plaintiff's belief that the employees it hired from Plaintiff were under a duty to maintain secrecy, which Defendant induced them to breach. (*Id.* at ¶¶ 135, 146).

Plaintiff's misappropriation claims are based on the conduct of three of Plaintiff's former employees who now work for Defendant. According to Plaintiff, each of these employees retained trade secret information after resigning from Plaintiff. The conduct in which each of these employees engaged is described below.

     i.    *Jennifer Aggabao*

Jennifer Aggabao, Plaintiff's former Director of Global Regulatory Affairs for Chemistry Manufacturing and Controls ("CMC") Biologics, began having discussions with Defendant in July 2022 about the possibility of her working for Defendant. (*Id.* at ¶ 84). At the time of these discussions, Aggabao was still employed by Plaintiff. (*Id.* at ¶ 89). Aggabao completed her last day of employment with Plaintiff on August 26, 2022, and began working for Defendant on August 28, 2022. (*Id.* at ¶¶ 96, 98). In her role with Plaintiff, Aggabao had access to Allergan Trade Secrets including, among other information, the Botox Reference Standard and CBPA technology. (*Id.* at ¶ 84). In the days and weeks leading up to her resignation and departure from Plaintiff, Aggabao electronically accessed and downloaded documents containing Allergan Trade Secrets at a rate that was inconsistent with her job responsibilities. (*Id.* at ¶¶ 89, 90). The Allergan Trade Secrets in these documents included "confidential information on internal best practices used by Allergan regulatory professionals to ensure consistency with manufacturing related submissions to agencies, manufacturing information, and Botox drug substance characterization analysis and potency information related to, *inter alia*, reference standard protocols, CBPA procedures and critical reagents, validation techniques, and stability data." (*Id.* at ¶ 91). Some or all of this

information is (or at least was, at the time Plaintiff filed its Complaint) "in the possession, custody, or control of [Defendant]." (*Id.*).[8]

Aggabao began working for Defendant just a few days after accessing and downloading these documents. (*Id.* at ¶ 99). Until her final day of employment with Plaintiff, Aggabao refused to disclose to her superior and her team where she would be working upon her resignation. (*Id.* at ¶¶ 94, 97, 98). Furthermore, the terms of her employment with Defendant included a 50 percent wage increase, title promotion, bonus pay, and company stock. (*Id.* at ¶ 101). From these facts, the Complaint concludes that "it is clear that [Defendant] has misappropriated Allergan Trade Secrets through Ms. Aggabao . . . ." (*Id.* at ¶ 101).

    *ii.    Cara Chastain*

Cara Chastain, Plaintiff's former Executive Director of Facial Aesthetics Marketing, resigned from Plaintiff in August 2021. (*Id.* at ¶ 104). Upon her resignation, Chastain stated to Plaintiff that she did not have another job lined up, when in fact she already had accepted a position with Defendant. (*Id.*). In her last few days with Plaintiff, Chastain "sought access" to Allergan Trade Secrets, including "confidential competitive strategies in response to [Defendant's] then-pending Daxxify product," under the false pretense that this information was needed to perform

---

[8] Although Plaintiff does not use the phrase, "on information and belief," the Court considers the allegation in the last sentence of ¶ 91 of the Complaint, which begins with "Allergan understands that . . .[,]" to be in substance an allegation made "upon information and belief" and will treat it as such. As the undersigned has previously stated, "[a] fact of which a plaintiff lacks personal knowledge nevertheless *in some situations* can be well-pleaded even if alleged only on 'information and belief.'" *Delanis v. Metro. Gov't of Nashville & Davidson Cnty.*, No. 3:22-CV-00469, 2023 WL 6542305, at *8 (M.D. Tenn. Oct. 6, 2023). These situations include "when the alleged fact would be peculiarly within the knowledge of one or more opposing parties . . . [and] is not inconsistent with the other alleged facts and not facially implausible." *Id.* The particular fact alleged here, that Defendant is in possession of the trade secrets accessed or downloaded by Aggabao shortly before her resignation, is the kind of fact that is not facially implausible and would be peculiarly within the knowledge of Defendant and not Plaintiff. Accordingly, the Court finds this allegation to be well-pleaded (and therefore appropriately treated as true), despite it being pled in a manner that the Court considers tantamount to pleading on "information and belief."

her job duties. (*Id*. at ¶ 106). Chastain also attended a financial strategy meeting after falsely stating that she did not have another position lined up. (*Id*.).

iii.    *Wendy Shepherd*

Wendy Shepherd, Plaintiff's former Senior Business Development Manager, worked on Botox and Juvéderm sales efforts and had access to highly confidential customer lists and internal sales data before leaving to join Defendant as a "Prestige Aesthetic Consultant" in February 2023. (*Id*. at ¶¶ 111, 112). In preparation for her job interview with Defendant, Shepherd created a PowerPoint presentation (slide deck) containing Allergan Trade Secrets. (*Id*. at ¶¶ 112-114). Shepherd then saved that slide deck on her work computer and sent it to her personal email address. (*Id*. at ¶ 114). The slide deck included a list of Plaintiff's top salespeople, with associated sales figures and geographic locations as well as a screenshot of 2022 sales figures for Botox and Juvéderm. (*Id*. at ¶ 114). It also included a "30-60-90 Day Business Plan" with key points stating, "Begin to convert Allergan accounts and onboard them" and "Close business with new customers as well as Allergan accounts." (*Id*.). The day after her interview with Defendant, Shepherd sent to her personal email address additional documents including internal sales tracking, customer lists, action plans, strategies for responding to frequently asked questions, pricing calculators for Botox and Juvéderm sales, business strategy templates, performance reports, and a customer email distribution list, all of which are Allergan Trade Secrets. (*Id*. at ¶¶ 117-18; 120). She then deleted numerous files and folders from her work computer. (*Id*. at ¶ 119).

Defendant intentionally placed these employees, along with other former Plaintiff employees,[9] into positions with responsibilities consistent with those in their former positions,

---

[9] Other employees named in the Complaint that allegedly worked for Plaintiff before joining Defendant include Julian Gangoli, Plaintiff's previous President of North American Pharmaceutical Division who was appointed to Defendant's Board as a member of the Audit Committee; David Hollander, who was appointed

"ensuring that [Defendant] would benefit from Allergan Trade Secrets." (*Id*. at ¶ 124). Defendant's recruitment of these employees was part of a concerted pattern and practice of "filling its ranks with individuals who have intimate knowledge of the Allergan Trade Secrets . . . ." (*Id*. at ¶ 75). This alleged "unlawful scheme" has led to accelerated efforts to obtain FDA approval for an alternative CBPA and more rapid commercial entry for Daxxify and the RHA Collection, along with improved chances of obtaining approval for Defendant's Botox biosimilar. (*Id*. at ¶ 127).

## II.    Procedural History

On April 28, 2023 Plaintiff initiated this lawsuit by filing its Complaint (Doc. No. 1), which included two counts. Count I is for misappropriation in violation of the DTSA and Count II is for misappropriation in violation of the TUTSA. Plaintiff claims that its former employees, namely Aggabao, Chastain, and Shepherd, breached their duty of secrecy by improperly acquiring and using the Allergan Trade Secrets for the benefit of Defendant. (*Id*. at ¶ 134). The Complaint alleges that Defendant induced these breaches of duty to gain access to Allergan Trade Secrets and use them to its advantage, and that Defendant "knew or had reason to know it acquired and used Allergan Trade Secrets by improper means." (*Id*. at ¶ 135). And, according to Plaintiff, Defendant has used and/or intends to use Plaintiff's trade secrets to Plaintiff's detriment without Plaintiff's consent in violation of the DTSA and TUTSA. (*Id*. at ¶ 137).

In addition to seeking damages, attorney's fees, and costs, the Complaint includes a demand for a declaration that Defendant has no rights to use Allergan Trade Secrets and permanent injunctive relief prohibiting Defendant (and all those acting on behalf of Defendant) from, among

---

as Defendant's Chief Medical Officer; Dustin Sjuts, who became Defendant's President; Dwight Moxie, former in-house attorney for Plaintiff who became Senior Vice President, General Counsel, and Corporate Secretary for Defendant; and Taryn Conway, who became Vice President of Marketing for Defendant. (*Id*. at ¶¶ 78-80). Defendant does not allege any specific conduct that these individuals engaged in, but asserts that Defendant publicized each of their hirings and, in doing so, "touted" their Allergan experience. (*Id*. at ¶ 79).

other things, possessing, disclosing, or using Allergan Trade Secrets or engaging in activity that involves products, processes, or methods that are derived from Allergan Trade Secrets. (*Id*. at ¶ 151(C)). Plaintiff further demands injunctive relief requiring, among other things, Defendant to return all Allergan Trade Secrets and any proceeds obtained through misappropriating such secrets, and to identify each individual who participated in misappropriation of Allergan Trade Secrets. (*Id*.).

## STANDARD OF REVIEW

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*.; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), cited in *Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be

appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bold" allegations. *Id*. at 681. The question is whether the remaining allegations—factual allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Rule 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). When a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment. *Doe v. Ohio State Univ.,* 219 F.Supp.3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018).

On a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross and Blue Shield,* 552 F.3d 430, 433 (6th Cir. 2008). To put it only slightly differently, "[a] Rule 12(b)(6) movant 'has the burden to show that the plaintiff failed to state a claim for relief.'" *Willman v. Att'y Gen. of United States*, 972 F.3d 819, 822 (6th Cir. 2020) (quoting *Coley v. Lucas Cnty*., 799 F.3d 530, 537 (6th Cir. 2015)). That is not to say that the movant has some *evidentiary* burden; as should be clear from the discussion above, evidence (as opposed to *allegations* as construed in light of any allowable matters outside the pleadings) is not involved on a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of *explanation*; since the movant is the one seeking dismissal, it is the

one that bears the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim.

DISCUSSION

## I.  Trade Secret Misappropriation

As noted above, Plaintiff has brought claims for misappropriation of trade secrets under both the DTSA and TUTSA. "The respective requirements for establishing misappropriation under these statutes are largely the same, and so the Court will conduct a single analysis." *PSC Indus., Inc. v. Johnson*, No. 3:19-CV-00362, 2021 WL 1663574, at *11 (M.D. Tenn. Apr. 28, 2021) (citing *Great Am. Opportunities, Inc.*, 2018 WL 418567, at *3 (collecting cases)).

As relevant here, the DTSA defines "misappropriation" as:

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who–

(i) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was–

(I) derived from or through a person who had used improper means to acquire it;

(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain [its] secrecy or limit [its] use . . . .

18 U.S.C. § 1839(5); Tenn. Code Ann. § 47-25-1702(2). "Improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and does not include . . . any other lawful means of acquisition." 18 U.S.C. § 1839(6); Tenn. Code Ann. § 47-25-1702(1).

As made clear by the statutory definition, a showing that the defendant acquired the trade secret by "improper means" is not necessarily required to establish misappropriation on the part of that defendant. True, if a plaintiff shows that a defendant merely acquired (without also using or disclosing) the plaintiff's trade secret(s), then indeed the plaintiff must show that the defendant did so by "improper means." But if a defendant *used or disclosed* a plaintiff's trade secret, then the plaintiff need not show that the trade secret was acquired by improper means. True, the plaintiff can prevail by making this showing; however, the plaintiff alternatively can prevail by showing that the defendant used or disclosed the trade secret under circumstances described in either § 1839(5)(B)(ii)(II) or § 1839(5)(B(ii)(III), neither of which requires a showing of improper means.

Accordingly, whether Plaintiff has alleged facts sufficient to state a claim that Defendant *used*[10] Plaintiff's trade secrets is an issue materially distinct from whether Plaintiff has pled facts sufficient to state a claim that Defendant merely *acquired* its trade secrets, even though courts often overlook the distinction. With this in mind, the Court will first analyze whether Plaintiff has pled facts sufficient to state a claim that Defendant acquired Plaintiff's trade secrets. Then, the Court will separately evaluate whether Plaintiff has pled facts sufficient to state a claim that Defendant used Plaintiff's trade secret(s). Possible conclusions from that evaluation include that Plaintiff has pled facts: (a) insufficient to plausibly suggest that Defendant either acquired *or* used Plaintiff's trade secrets; (b) sufficient to plausibly suggest that Defendant acquired Plaintiff's trade secrets but insufficient to plausibly suggest that Defendant used Plaintiff's trade secrets; or (c) sufficient to plausibly suggest that Defendant both acquired *and* used Plaintiff's trade secrets. Only

---

[10] Although Plaintiff has alleged that Defendant acquired and used its trade secrets, it has not specifically alleged that Defendant disclosed those trade secrets to a third party. Accordingly, for the sake of clarity, the Court will limit its discussion to the sufficiency of Plaintiff's allegations of acquisition and use of trade secrets by Defendants.

after it makes that determination will the Court turn to the question (if necessary) of whether Defendant acquired or used (as the case may be) Plaintiff's trade secret(s) with the requisite knowledge to be liable for misappropriating Plaintiff's trade secrets.

A.  Acquisition of Trade Secrets

Defendant argues that Plaintiff failed to state a claim for misappropriation because (in Defendant's view) the Complaint does not allege that Defendant—as opposed to Plaintiff's former employees—acquired Plaintiff's trade secrets. (Doc. No. 34 at 5).[11] Plaintiff responds by pointing to allegations in its Complaint that, between the time Aggabao accepted a position with Defendant and the time she resigned from Plaintiff, she engaged in a "flurry of activity" that involved previewing, accessing, and downloading documents that contained Allergan Trade Secrets. (Doc. No. 1 at ¶ 91). The Complaint further alleges that Aggabao accessed and/or downloaded this information for the benefit of Defendant and that Defendant is "currently in the 'possession, custody, or control' of this information." (Doc. No. 1 at ¶ 91).[12] Plaintiff points also to its allegations that Shepherd prepared, for use in an employment interview with Defendant, a PowerPoint presentation that contained "significant amounts of Allergan Trade Secrets" and that Shepherd, using her work email address, sent that document, along with others containing Allergan Trade Secrets, from her work computer to her personal Gmail account. (Doc. No. 1 at ¶¶ 114, 117-18). The slides in that slide deck contained proprietary information, including a list of Plaintiff's top salespeople, sales figures, and geographic locations, along with screenshots of sales figures for

---

[11] When citing to a page in a document filed by one of the parties (other than the Complaint), the Court endeavors to cite to the page number ("Page __ of __") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing, if such page number differs from the page number originally provided by the author/filer of the document. When citing to the Complaint, however, the Court endeavors to cite to the specific paragraph of the Complaint, rather than the page number.

[12] Consistent with the Court's discussion above, the allegations referred to in this paragraph are accepted for present purposes as true.

2022 (*Id*. at ¶ 114), all of which constitute Allergan Trade Secrets. (*Id*. at ¶ 34, 114). The presentation also included a "30-60-90 Day Business Plan" with text that stated, "Begin to convert Allergan accounts and onboard them" and "Close business with new customers as well as Allergan accounts." (*Id*. at ¶ 114).

To support its contention that the facts alleged meet the applicable pleading standard, Plaintiff relies in large part on *Bombardier Inc. v. Mitsubishi Aircraft Corporation,* 383 F. Supp. 3d 1169 (W.D. Wash. 2019), which likewise involved allegations that the defendants successfully recruited then-employees of the plaintiff.[13] *Id*. at 1175. In *Bombardier*, MITAC, MITAC America,[14] and AeroTEC, successfully recruited several of the plaintiff's key employees[15] to work on a specific project. *Id*. The plaintiff took steps to stop the recruitment of its employees, such as informing the defendants and its subsidiaries of the ongoing confidentiality duties that the relevant employees owed to the plaintiff. *Id*. at 1176. Despite these warnings, several of the aforementioned "successfully recruited" employees left to join the defendant companies, and in the days and weeks before doing so, "absconded with highly sensitive . . . trade secret information." *Id*. For example,

---

[13] The Court describes the facts alleged by the plaintiff in *Bombardier* as true (unless otherwise indicated) to reflect that the district court deciding the case accepted these facts as true.

[14] MITAC America is a subsidiary of Mitsubishi Aircraft Corporation (MITAC). MITAC was established to conduct the Mitsubishi Regional Jet (MRJ) program and MITAC created MITAC America to help design, develop, and certify the MRJ. *Id*. at 1174. MITAC also employed AeroTEC, a small engineering company, to provide technical support for MITAC's MRJ program. *Id*. at 1174. Together, the three companies "jointly staffed" and worked on the MRJ project, in direct competition with the plaintiff. *Id*. at 1179. In *Bombardier*, all three entities were named as defendants, as also were the individual employees who formerly worked for the plaintiff and were accused of stealing the plaintiff's trade secrets. By contrast, in the present case none of the involved former employees are named as defendants.

[15] The individual employees who stole the plaintiff's trade secrets were technically employed by MITAC or AeroTEC, and the plaintiff argued that those employees brought the stolen trade secrets to MITAC or AeroTEC, who then relayed the trade secrets to MITAC America. *Id*. at 1179. Because the three entities (MITAC, MITAC America, and AeroTEC) worked so closely together with each other on the relevant project, the Court did not find it too speculative to infer from the fact that the trade secrets were acquired by MITAC America and AeroTEC were then relayed to MITAC America. *Id*.

on his last day of working for the plaintiff before joining AeroTEC, one such employee sent two proprietary PowerPoint slide decks which contained "highly sensitive trade secret information" from his work email account to his personal email account. *Id*. Another employee, on her way out, likewise sent documents containing trade secrets to her personal email account. *Id*.

In denying a motion to dismiss a misappropriation claim brought under the DTSA, the court concluded that the plaintiff had plausibly alleged that MITAC America and AeroTEC—rather than merely the former employees—acquired and/or used the plaintiff's trade secrets. *Id*. at 1181. The court found that these facts (accepted as true) differed from facts in other cases because the plaintiff alleged "the specific trade secrets that were taken by [the plaintiff's] former . . . employees in the days and weeks before they joined MITAC, MITAC America, and AeroTEC," and alleged that "the relevant trade secrets relate[d] to the exact reason that MITAC, MITAC America, and AeroTEC recruited these employees: to help certify the MRJ after a decade-long struggle to achieve certification." *Id*. Thus, "not only d[id the plaintiff] indicate motive and opportunity, but [the plaintiff] allege[d] that its former employees improperly acquired specific trade secrets in the days and weeks before joining the [d]efendant companies to aid the MRJ project. *Id*.

Similarly in the instant case, just two days before resigning from Plaintiff to join Defendant, Aggabao accessed and downloaded documents containing, among other Allergan Trade Secrets, Botox drug substance characterization analysis and potency information related to reference standard protocols, CBPA procedures and critical reagents, validation techniques, and stability data. (Doc. No. 1 at ¶ 91). The information that Aggabao accessed containing these trade secrets eventually ended up in the "possession, custody, or control" of Defendant. (*Id*.). Like in *Bombardier*, the trade secrets accessed and downloaded by Aggabao (and later acquired by

Defendant) related to the exact reason that Defendant recruited Aggabao and other employees of Plaintiff: to expand Daxxify's regulatory filings and develop a Botox biosimilar. (*Id*. at ¶¶ 77-79, 86). In addition, Shepherd shared sales figures and geographic locations with Defendant in her job interview while still employed by Plaintiff.[16] (*Id*. at ¶ 114). The information thus shared also constitutes Allergan Trade Secrets.[17] (*Id*. at ¶ 34, 114). Accordingly, Plaintiff has sufficiently alleged that Defendant has at least *acquired* Allergan Trade Secrets from Aggabao and Shepherd.[18]

Defendant relies primarily on *Rezult Grp., Inc. v. Turkheimer* for the proposition that the mere hiring of a plaintiff's former employee is insufficient to state a claim for misappropriation against the new employer. No. 3:22-CV-00567, 2023 WL 1975239 (M.D. Tenn. Feb. 13, 2023). In *Rezult*, the plaintiff's former employee had access to a variety of the plaintiff's trade secrets, sent himself a confidential document upon his resignation, and erased all data from his laptop prior to starting work with a competitor of the plaintiff. *See id*. at *3. The plaintiff alleged that this conduct gave rise to an inference that the employee's new employer misappropriated its trade secrets. *See id*. at *7. But the court refused to infer from this "short list of facts" that the defendant misappropriated the plaintiff's trade secrets. *See id*. at *8. Instead, the court found that the

---

[16] Shepherd also sent from her work email to her personal email "internal sales tracking, customer lists, action plans, internal frequently asked question strategies more" along with "pricing calculators for Botox and Juvéderm sales," "business strategy templates, performance reports, and more." (*Id*. at ¶¶ 117, 118). However, Plaintiff has not alleged facts stating that Defendant acquired these additional trade secrets.

[17] The Court uses the term "Allergan Trade Secrets" herein to mean either *all* of the items that constitute trade secrets or (alternatively) only selected ones, depending on the context.

[18] By contrast, Chastain's situation is not comparable to that in *Bombardier*, as Chastain did not download or send herself any documents or information containing Allergan Trade Secrets. Instead, she merely requested access to documents containing Allergan Trade Secrets. (*Id*. at ¶ 106). Plaintiff has not specifically alleged that Chastain disclosed any of its trade secrets to Defendant, took any of its trade secrets on her way out, or even saw the documents containing trade secrets that she allegedly requested access to. From these facts, it is simply not plausible that *Defendant* used or acquired trade secrets based on the actions of Chastain. Thus, because the Complaint does not allege that Chastain even *accessed* Allergan Trade Secrets, the Court herein considers the facts related only to the conduct of Aggabao and Shepherd as a basis for the misappropriation claims.

plaintiff's allegations regarding the former employee's conduct, at most, implicated the former employee, not the new employer. *See id*. The court thus dismissed the plaintiff's claim for misappropriation of trade secrets based on these allegations, for failure to state a claim.

The Court might agree that it would be a stretch to infer *misappropriation* solely from the facts alleged in *Rezult*. But at this initial stage of the analysis, the Court need only consider whether Plaintiff has plausibly alleged facts to establish that Defendant *acquired* its trade secrets. And the Court is confident that one could infer from the facts presented here (which are more compelling than the "short list of facts" presented in *Rezult*) that Defendant at least *acquired* the trade secrets that Aggabao and Shepherd disclosed to Defendant.

The Court therefore finds that Plaintiff has plausibly alleged that Defendant acquired Plaintiff's trade secrets based on the conduct of Aggabao and Shepherd.

B. Use of Trade Secrets

Having concluded that Plaintiff has plausibly alleged that Defendant *acquired* Plaintiff's trade secrets, the Court will next assess whether Plaintiff has plausibly alleged that Defendant *used* its trade secrets.[19] Plaintiff argues that, in light of the Sixth's Circuit's decision in *Stratienko v. Cordis Corp.,* 429 F.3d 592 (6th Cir. 2005), it may rely on circumstantial evidence to prove that Defendant used its trade secrets because direct evidence of misappropriation (and use of trade secrets in particular) is not always available. (Doc. No. 43 at 15). In *Stratienko*, the plaintiff shared his design for a catheter device with the defendant in hopes of collaborating with the defendant on

---

[19] The Court reiterates that Plaintiff need not establish that Defendant has both acquired *and* used its trade secrets to make a showing of misappropriation under DTSA and UTSA. In general, either acquisition or use provides an avenue for a showing of misappropriation. However, as explained above, the requisite knowledge necessary to establish a misappropriation claim may vary depending on whether the defendant acquired the plaintiff's trade secrets or the defendant used the plaintiff's trade secrets. Accordingly, the Court must determine whether Plaintiff has plausibly alleged that Defendant used (or merely acquired) its trade secrets in order to apply the proper standard with respect to the Court's analysis of requisite knowledge.

a business venture. *Id*. at 596. The defendant declined the proposal, only to submit a patent application a few months later for a similar catheter device. *Id*. The plaintiff sued the defendant, asserting (among other claims) a claim for trade secret misappropriation. *Id*. The district court granted summary judgment in favor of the defendant because (according to the district court) the plaintiff lacked sufficient evidence that the defendant used his trade secret. *Id*. More specifically, the district court held that the plaintiff could not use circumstantial evidence of (1) the defendant's access to the plaintiff's secret and (2) the similarity between the plaintiff's secret and the defendant's catheter to show that the defendant used his design. *Id*. at 600.

On appeal, the Sixth Circuit court concluded that in general, use of a trade secret may be inferred from evidence that "(1) the misappropriating party had access to the secret and (2) the secret and the defendant's design share similar features." *Id*. The Sixth Circuit explained:

> Permitting an inference of use from evidence of access and similarity is sound because "[m]isappropriation and misuse can rarely be proved by convincing direct evidence." *Eden Hannon & Co*., 914 F.2d at 561 (citing *601 *Greenberg v. Croydon Plastics Co*., 378 F. Supp. 806, 814 (E.D. Pa. 1974)). Presented with "defendants' witnesses who directly deny everything," plaintiffs are often required to "construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what the plaintiffs allege happened did in fact take place." *Id*. Thus, requiring direct evidence would foreclose most trade-secret claims from reaching the jury because corporations rarely keep direct evidence of their use ready for another party to discover. Caselaw from other circuits thus suggests that Tennessee law would most likely permit circumstantial evidence of use in trade-secret cases.[20]

*Stratienko*, 429 F.3d at 600.[21]

---

[20] As at least one other court has recognized, *Stratienko* addressed the elements of misappropriation under Tennessee common law, not the TUTSA or DTSA, which are at issue here. *Williams-Sonoma Direct, Inc. v. Arhaus, LLC*, 109 F. Supp. 3d 1009, 1018 (W.D. Tenn. 2015). Plaintiff did not plead a violation of Tennessee common law protecting trade secrets. However, the Court is satisfied that the portion quoted here applies broadly to trade-secrets cases, including those under the TUTSA or DTSA.

[21] To be clear, in citing this explanation, the Court is not saying that *most* trade-secret claims deserve to reach a jury (or at least the summary-judgment stage) merely because a plaintiff has asserted them, and thus

Despite its broader conclusion that "circumstantial evidence in the form of access and similarity may *in some cases* be sufficient evidence of use," the Sixth Circuit court found that the plaintiff in that particular case could not show sufficient relevant similarity to permit a circumstantial inference of use. *Id*. The court reached this conclusion based on its finding that the plaintiff failed to demonstrate "similarity between his secret idea (not his product in general) and [the defendant's] device." *Id*. at 602. Thus, under *Stratienko*, the relevant inquiry with respect to similarity is not whether the plaintiff's and the defendant's products are similar. Rather, as far as the Court can tell, the *Stratienko*-suggested inquiry regarding similarity of design boils down to whether the plaintiff can show sufficient similarity between (i) the "innovative aspect" of the plaintiff's "secret idea" (i.e., trade secret) to which the defendant had access and (ii) the defendant's product; if so, the plaintiff has shown that a jury reasonably could infer that the defendant used the plaintiff's trade secret in developing its own product. *See id*.

    i.    *Access to Trade Secrets*

Defendant argues that the Complaint alleges no facts to show that Defendant had access to any of Plaintiff's trade secrets, and that therefore *Stratienko* is inapplicable because the Court would be required "to infer *both* access to the trade secrets *and* misappropriation thereof . . . ." (Doc. No. 46 at 7). But the Court does not find that it must *infer* access, or that an inference of access *and* use (as Defendant incorrectly suggests the Court must make) would render *Stratienko* inapplicable if in fact the Court did have to infer access. As discussed above, the Court accepts as true the Complaint's allegation that Defendant was in the "possession, custody, or control" of information containing Allergan Trade Secrets that was accessed and downloaded by Aggabao.

---

it is unfair to require direct evidence. Instead, the Court is saying that *some* trade-secret claims do deserve to reach a jury (or at least the summary-judge stage) even though the plaintiff is not in a position to allege in its complaint direct evidence of misappropriation; the question here is whether Plaintiff's claims are among such trade-secret claims.

The Court similarly accepts as true the allegation that Shepherd shared Allergan Trade Secrets (specifically, sales figures and geographic locations) with Defendant during her interview with Defendant. Therefore, as discussed above, Plaintiff has clearly alleged facts that (taken as true as required here) establish that Defendant had access to (and acquired) its trade secrets from the conduct of Aggabao and Shepherd.

ii.    *Similarity of Design*

Based on *Stratienko*, the Court must evaluate the similarity between the features of Defendant's products (as relevant here, Daxxify and Defendant's Botox biosimilar) and the trade secrets to which Defendant had access. The Court perceives that such features properly subject to this comparison includes features not only of Defendant's product itself, but also of the development and/or testing of Defendant's products.

Similarities exist between the trade secrets to which Defendant had access and the changes Defendant seeks to make to its method for determining the potency of Daxxify, Defendant's competitor to Botox. Defendant originally obtained approval for Daxxify by relying on a traditional LD50 mouse-lethality test to determine potency. (*Id*. at ¶ 51). Now, Defendant is seeking FDA approval for a cell-based potency assay (CBPA) for Daxxify that is comparable to the CBPA testing method Plaintiff uses for Botox. (*Id*. at ¶ 52). Notably, information related to Plaintiff's CBPA procedures is among the Allergan Trade Secrets to which Defendant had access through the conduct of Aggabao. (*Id*. at ¶ 34, 91). The Court therefore may infer from the combination of access to this trade secret and its similarity to Defendant's proposed changes to its method for testing and determining the potency of Daxxify, that Defendant used Plaintiff's trade secrets.

The analysis with respect to Defendant's Botox biosimilar is slightly more complicated. Defendant has repeatedly claimed that it will soon file regulatory papers seeking approval for a "copycat 'biosimilar' to Botox." (Doc. No. 1 at ¶ 5). By definition, a biosimilar shares features with the product that it seeks to imitate. (*See id.* at ¶ 57 ("A biosimilar manufacturer must show that its proposed product is 'highly similar' to the already-licensed biologic product and that there are no 'clinically meaningful differences' between the two products in terms of 'safety, purity, and potency.'" (quoting 42 U.S.C. § 262))). But as Defendant points out (and as the Court explained above), evidence of similarities *between two products* does not warrant an inference of use, even where the plaintiff can show that the defendant had access to the plaintiff's trade secrets. *See Stratienko*, 429 F.3d at 602. Instead, the relevant inquiry here is whether there is sufficient similarity between Defendant's product and the trade secrets to which Defendant had access. The facts presented here slightly complicate this inquiry because, at least at the time the Complaint was filed, Defendant's biosimilar had not yet been approved or released, making it difficult for Plaintiff to point out how the features of Defendant's biosimilar are similar to the trade secrets to which Defendant had access. Nevertheless, the Complaint certainly goes beyond pointing to facts comparing Plaintiff's product (Botox) to Defendant's pending product (the Botox biosimilar).

For example, the Complaint asserts that it would be extremely difficult, "if not impossible," for anyone to produce a Botox biosimilar without access to its trade secrets[22] concerning structural

---

[22] As support for Plaintiff's factual assertion that it would be nearly impossible for anyone to create a Botox biosimilar, the Complaint states:

> It is widely acknowledged in the field that the approval of any toxin biosimilar would be unprecedented, including based on the complexities in characterizing the drug product given that each product is defined by unique potency units. The FDA has never approved, or even accepted for filing, a biosimilar application referencing Botox or any other licensed toxin.

characterization and elucidation studies, the Botox reference standard, and strategies for determining potency. (Doc. No. 1 at ¶ 8). The Complaint further states that Defendant had access to these exact trade secrets (through Aggabao) and that this information is precisely the type of information that an applicant would typically submit to the FDA about a particular biologic product to obtain biosimilar approval for that product. (*Id*. at ¶¶ 34, 59). Taking these facts together then, the Complaint asserts facts indicating that it would be extremely difficult, "if not impossible," for anyone to produce the biosimilar for which Defendant plans to seek approval without using the precise trade secrets to which Defendant had access. (*Id*. at ¶ 8).

So, although Plaintiff has not alleged facts making a direct comparison between its trade secrets and Defendant's biosimilar, Plaintiff has alleged facts demonstrating similarity between Plaintiff's trade secrets (to which Defendant had access) and the information that Defendant almost certainly would have needed to develop and obtain approval for its Botox biosimilar. Based on this connection, the Court finds that the Complaint has presented enough circumstantial evidence from which one could plausibly infer that Defendant used Plaintiff's trade secrets in creating and obtaining approval for its Botox biosimilar.

By contrast, with respect to the trade secrets acquired by Defendant from Shepherd (namely sales figures and geographic locations of customers) the Complaint does not include specific allegations that would demonstrate similarity between those trade secrets and the sales and marketing approach taken by Defendant with respect to Defendant's competitor products. The Complaint does not allege, for example, that Defendant targeted the specific areas highlighted by Shepherd's PowerPoint as prime locations for targeting customers, or that Defendant recruited the

---

(Doc. No. 1 at ¶ 62). The Complaint also states that "[c]haracterizing a botulinum toxin product is unlike characterizing any other product in the market. Elucidating the structure of the drug substance in a BoNT product, for example, can be extraordinarily difficult." (*Id*. at ¶ 60).

precise individuals named as top performing sales representatives in Shepherd's PowerPoint. In the absence of allegations showing such similarity, the Court will not infer from mere access to these trade secrets that Defendant *used* the trade secrets.

### C. Defendant's Reliance on Cases Rejecting a Theory of "Misappropriation-by-Inference" Is Unavailing

Defendant points also to several non-binding cases in which the court granted a motion to dismiss where the plaintiffs attempted to allege "misappropriation by inference merely because the defendant hired the plaintiff's former employee." (Doc. No. 34 at 15 (citing *Biomin Am., Inc. v. Lesaffre Yeast Corp.*, No. 2:20-CV-02109-HLT, 2020 WL 2395200, at *6 (D. Kan. May 12, 2020); *Wright Med. Tech., Inc. v. Paragon 28, Inc.*, No. 18-CV-00691-PAB-STV, 2019 WL 4751807, at *4 (D. Colo. Sept. 30, 2019); *M/A-COM Technology Solutions, Inc. v. Litrinium, Inc.*, SACV 19-220 JVS (JDEx), 2019 U.S. Dist. LEXIS 212479, at * 26 (N. D. Cal. Sep. 23, 2019); *AssuredPartners of Oregon, LLC v. Reese*, No. 6:22-cv-00673-MC, 2022 U.S. Dist. LEXIS 233618, at * 7-9 (D. Or. Dec. 30, 2022); *Bayco Products v. Lynch*, No. 3:10- cv-1820-D, 2011 U.S. Dist. LEXIS 46163, at * 15 (N. D. Tx. Apr. 28, 2011)). But contrary to Defendant's characterization of the Complaint, Plaintiff has based its misappropriation claim on more than the mere fact that Defendant hired one of its former employees. For example, Plaintiff has also alleged that: (1) Defendant hired not just one former employee, but rather several former employees, of Plaintiff all of whom went to work for Defendant directly after leaving Plaintiff (Doc. No. 1 at ¶¶ 55; 75-81); (2) Defendant induced these employees to conceal their plans to join Defendant during the final days and weeks of their tenure with Plaintiff (*Id.* at ¶ 7; 88-89; 92-95; 97-98); (3) Defendant has made faster-than-expected progress in obtaining FDA approval for an alternative CBPA and has made rapid commercial entry for Daxxify and products in the RHA Collection (*Id.* at ¶¶ 125-128); and (4) these advancements occurred only *after* Defendant hired away from

Plaintiff multiple individuals (including Aggabao, Chastain, and Shepherd) who had access to highly sensitive and confidential information and placed them in positions in which such information would be decidedly beneficial to Defendant. (*Id.* at ¶¶ 124, 126).

Moreover, to the extent that the facts in any of the additional cases cited by Defendant are comparable to this case, none of those cases are from the Sixth Circuit, and thus are not necessarily subject to the lenient standard for circumstantial evidence of use established by *Stratienko*.[23]

In sum, Plaintiff has adequately alleged facts from which the Court may infer that Defendant acquired Allergan Trade Secrets through the conduct of Aggabao. Also, based on circumstantial evidence of access and similarity as discussed above, Plaintiff has adequately alleged facts from which the Court may infer, under *Stratienko*, that Defendant used the trade secrets it acquired from Aggabao.[24] The Court, however, declines to infer from the Complaint that Defendant used the trade secrets it acquired from Shepherd.[25]

---

[23] As the court in *Stratienko* acknowledged, other circuit courts (including the Ninth Circuit—from within which several of the cases relied on by Defendant come—have also permitted an inference of use from circumstantial evidence in trade secret cases. *See Stratienko*, 429 F.3d at 600. But to the extent that courts within those circuits follow the *Stratienko* approach (or something similar), the particular cases from district courts within those circuits cited by Defendant do not apply the *Stratienko* approach or acknowledge *Stratienko*, despite being decided after *Stratienko*.

[24] The Court's rationale here for inferring use under *Stratienko* does not necessarily apply to all of the Allergan Trade Secrets. The Court wishes to emphasize that it is not saying that use of all Allergan Trade Secrets is properly inferable here. But the Court does discern that the use of at least the following Allergan Trade Secrets is inferable: "Botox drug substance characterization analysis and potency information related to reference standard protocols, CBPA procedures and critical reagents, validation techniques, and stability data." (Doc. No. 1 at ¶ 91). The Court need not determine at this time whether the use of other Allergan Trade Secrets is inferable under the rationale of *Stratienko*; the point here is that the claim of misappropriation survives the instant Motion even if only based on some of the Allergan Trade Secrets, and the Court is not required to parse out the various Allergan Trade Secrets to make this (limited and motion-to-dismiss-stage-specific) point. Defendant retains the right to make, on motion for summary judgment or at trial, any argument it wants to make as to which Allergan Trade Secrets it did or did not actually use.

[25] To be clear, the trade secrets acquired by (but not used by) Defendant from Aggabao nevertheless could support a misappropriation claim if the acquisition was by improper means. However, as the Court explains below, the Complaint does not allege facts sufficient to plausibly allege that those trade secrets were acquired by improper means.

D. <u>Requisite Knowledge</u>

As just explained, the Court has concluded that Plaintiff has alleged facts from which the Court may plausibly infer that Defendant acquired *and* used some of its trade secrets, and acquired but did not use others. The Court must next determine whether Plaintiff has alleged that Defendant used the trade secrets (i.e., the ones it actually did use) with the requisite knowledge, or acquired the trade secrets through improper means, such that the acquisition and/or use, respectively, of Plaintiff's trade secrets would constitute misappropriation.

As previously discussed, where a defendant has used or disclosed (rather than merely acquired) a plaintiff's trade secrets without consent, a plaintiff need not show that the defendant acquired the trade secrets by "improper means." *See* 18 U.S.C. § 1839(5)(B); Tenn. Code Ann. § 47-25-1702(2)(B). Instead, a plaintiff may prove misappropriation by showing that at the time the defendant used the plaintiff's trade secret without consent, he knew or had reason to know that the trade secret was "derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy or limit the use of the trade secret." 18 U.S.C. § 1839(5)(B)(ii)(III); Tenn. Code Ann. § 47-25-1702(2)(B)(ii)(c). Plaintiff has alleged facts that (accepted as true) are sufficient to make this showing.

All current and former employees of Plaintiff (including, of course, Aggabao) are under a duty to keep Allergan Trade Secrets confidential and to refrain from using or disclosing such information other than for Plaintiff's benefit. (Doc. No. 1 at ¶¶ 134, 145). Defendant was aware that Plaintiff's former employees were under such a duty because Plaintiff sent Defendant a warning letter about the potential for misuse of its trade secrets by former employees who had joined Defendant. (*Id*. at ¶ 71). Defendant acknowledged that it received that letter and admitted that it "was aware that former [Plaintiff] employees hired by [Defendant] may have continuing

obligations not to use or disclose confidential or proprietary information belonging to their former employers, including [Plaintiff]." (*Id*. at ¶¶ 70-72). Defendant also warned its shareholders of litigation risks associated with hiring personnel from competitors. (*Id*. at ¶ 9). It is plausible, based on these facts, that Defendant knew or should have known that the trade secrets it acquired were derived from a person (Aggabao) who owed a duty to Plaintiff to maintain the secrecy of the trade secrets or limit their use. *See* 18 U.S.C. § 1839(5)(B)(ii)(III); Tenn. Code Ann. § 47-25-1702(2)(B)(ii)(c). Moreover, as the Court concluded above, Plaintiff has adequately alleged that Defendant used Plaintiff's trade secrets despite having this knowledge. Accordingly, Plaintiff has alleged facts that plausibly suggest that Defendant has misappropriated Plaintiff's trade secrets under 18 U.S.C. § 1839(5)(B)(ii)(III).[26]

By contrast, to show that Defendant misappropriated the trade secrets that Defendant acquired from Shepherd (but did *not* use), Plaintiff must show that the acquisition occurred by improper means. *See* 18 U.S.C. § 1839(5)(A); Tenn. Code Ann. § 47-25-1702(2)(A). As the Court noted above, "improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and does not include . . . any other lawful means of acquisition." 18 U.S.C. § 1839(6); Tenn. Code Ann. § 47-25-1702(1). Here, Plaintiff relies exclusively on a theory that Defendant induced Shepherd to disclose Plaintiff's trade secrets to Defendant in breach of her duty to Plaintiff to maintain secrecy of Plaintiff's trade secrets. (Doc. No. 43 at 16). However, the Complaint lacks facts to plausibly support this claim.

The Complaint alleges only that Shepherd received an offer of employment from Defendant. (*Id*. at ¶ 115). The Court cannot plausibly infer from this fact alone that Defendant

---

[26] The analogous provision of TUTSA is § 47-25-1702(2)(B)(ii)(c).

induced Shepherd to breach her duty to maintain secrecy. Such an inference would require additional facts, such as allegations that the benefits and perks of the employment offer were contingent in some way on disclosing to Defendant Plaintiff's trade secrets to which Shepherd had access. *See, e.g., Hedgeye Risk Mgmt., LLC v. Dale*, No. 21CV3687ALCRWL, 2023 WL 6386845, *8 (S.D.N.Y. Sept. 29, 2023) (denying a motion to dismiss and finding inducement of a breach of duty of confidentiality giving rise to misappropriation where the defendant promised direct or indirect compensation for giving defendant access to confidential information and trade secrets). Such allegations are absent here.[27] Therefore, because the Complaint does not sufficiently allege facts to support Plaintiff's claim that Defendant induced Shepherd to breach her duty to maintain secrecy, Plaintiff cannot establish that Defendant acquired trade secrets from Shepherd by improper means.[28]

---

[27] Paragraph 124 of the Complaint states that "Revance intentionally placed Jennifer Aggabao, Cara Chastain, Wendy Shepherd and other former Allergan employees into positions consistent with their prior responsibilities at Allergan, ensuring that Revance would benefit from Allergan Trade Secrets." Even if the Court were to accept the allegations in this paragraph as true, they do not provide facts from which the Court may infer that Defendant induced Plaintiff's former employees to breach their duty of secrecy. The fact that Defendant may have hired employees away from Plaintiff and placed them in similar positions may support the notion that Defendant had access to and/or benefitted from the trade secrets to which those employees had access. However, it does not provide sufficient facts from which the Court may conclude that Defendant took some action to *induce* those employees to share Plaintiff's trade secrets. Moreover, Plaintiff has offered no facts from which the Court could infer that Plaintiff had knowledge of what Defendant did "intentionally."

[28] To reiterate, the claim of misappropriation survives the instant Motion even if only based on some of the Allergan Trade Secrets. Therefore, the Court's conclusion that the Complaint does not adequately allege that Defendant misappropriated the trade secrets Defendant acquired from Shepherd does not affect the Court's ultimate decision to deny the Motion, nor does it warrant granting the Motion with respect to only certain Allergan Trade Secrets (e.g., all of those that the Court conceivably could parse out as not having been adequately alleged to have been misappropriated). But Defendant retains the right to make, on motion for summary judgment or at trial, any argument it wants to make as to which Allergan Trade Secrets it did or did not actually misappropriate.

## II. Identification of Trade Secrets

Defendant asserts that Plaintiff's misappropriation claims should be dismissed because (in its view) the Complaint fails to identify the purportedly misappropriated trade secrets with reasonable particularity, and because at least some of the Allergan Trade Secrets do not qualify for trade-secret protection under relevant law.

Defendant first contends that, with respect to subpart (iii) of Paragraph 34's definition of Allergan Trade Secrets (concerning cell-based potency assay-technology),[29] Plaintiff's Complaint fails to identify the purported trade secrets with sufficient particularity to distinguish them from public information. (Doc. No. 34 at 17-18). Defendant argues that Plaintiff's own patent filing, attached to the Motion at Doc. No. 33-1, publicly discloses "reagents, standard operating procedures, protocols, and data associated with Allergan's CBPA technologies," which are also named as Allergan Trade Secrets. (*Id.*). Because Plaintiff has not explained how the items in subpart (iii) of Paragraph 34 of the Complaint differ from those that were publicly disclosed in its patent filing (Defendant argues), Plaintiff has failed to "particularize and identify the purportedly misappropriated trade secrets with specificity," as required to state a claim. *NexPay, Inc. v. Comdata Network, Inc.,* No. 3:14-CV-01749, 2018 WL 4185374, at *10 (M.D. Tenn. Aug. 30, 2018).

In response, Plaintiff argues that the Court should not consider documents outside the Complaint itself. (Doc. No. 43 at 24-25). Under the circumstances presented here, the Court agrees. Fed. Rule Civ. P. 12(d) states that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for

---

[29] Part (iii) of Paragraph 34 names "critical reagents, standard operating procedures, protocols, and data associated with Allergan's CBPA technologies" as constituting Allergan Trade Secrets.

summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." However, there is an exception to this Rule: "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008); *see also Doe*, 219 F. Supp. 3d at 652-53; *Blanch*, 333 F. Supp. 3d at 791-92. The patent filing referenced by Defendant and attached to the Motion at Doc. No. 33-1 is not even referenced in the Complaint and is certainly not central to Plaintiff's claims. Accordingly, the circumstances under which the exception to Rule 12(d) operates are not present here, so the Court may not properly consider the exhibit upon which Defendant's argument is based. The Court therefore rejects Defendant's argument that the Complaint fails to identify the Allergan Trade Secrets included in subpart (iii) of Paragraph 34 with sufficient particularity to state a claim.

Defendant next asserts that Plaintiff's Botox Reference Standard is not a trade secret, because (according to Defendant) the standard is "readily ascertainable through proper means." (Doc. No. 34 at 18). But the Court already concluded above that it must accept as true Plaintiff's allegation that the items listed in ¶ 34 of the Complaint and referred to by Plaintiff as "Allergan Trade Secrets" indeed qualify for trade-secret protection under DTSA and TUTSA. This is so because Plaintiff has supported its assertion that the Allergan Trade Secrets qualify for trade-secret protection (which is a question of fact) with factual matter relating to the criteria used to define trade secrets under the DTSA and TUTSA.

Defendant presents an argument that, if accepted, would negate the effect of the Court's above-referenced conclusion. That is, Defendant argues that even if the Complaint does include

facts that (accepted as true) otherwise would establish that the Botox Reference Standard qualifies

for trade-secret protection, Plaintiff nevertheless has pled itself out of establishing this by including

information in the Complaint that necessarily disqualifies the Botox Reference Standard from

trade-secret protection. Specifically, Defendant argues that

> Allergan also makes much of its supposedly secret "reference standard" "used to determine whether manufactured lots of Botox drug substance and drug product fall inside or outside of acceptable potency levels." Compl. ¶ 30. Such information, however, only qualifies as trade secret if it is not "readily ascertainable through proper means." 18 U.S.C. § 1839(3); TN Code § 47-25- 1702(4). And Allergan admits that "the primary way to assess potency was through use of in vivo LD50 mouse lethality test, which is a bioassay that generally involves administering serial dilutions of BoNT to groups of mice." Compl. ¶ 31. Therefore, the Complaint does not allege facts sufficient to show one could not reverse engineer the "reference standard" by simply administering "serial dilutions of [Botox] to groups of mice" as scientists have been doing since at least 1927. See Compl. ¶ 31. Per the Complaint, doing so would, presumably, reveal the "acceptable potency levels" for Allergan.

(Doc. No. 34 at 18) (footnote omitted).

In other words, Defendant asserts that the Complaint includes specific information

suggesting the possibility that the Botox Reference Standard could be reverse-engineered. And

although the DTSA and TUTSA do not use the phrase "reverse engineering," they do require that

information be "not readily ascertainable through proper means" in order to qualify as a trade

secret. 18 U.S.C. § 1839(3); Tenn. Code Ann. § 47-25-1702(4)(A). Thus, because (according to

Defendant) the Complaint alleges facts affirmatively suggesting the possibility that the Botox

Reference Standard could be reverse-engineered, the Court cannot conclude from the facts alleged

in the Complaint that the Botox Reference Standard is "not readily ascertainable through proper

means," as required by DTSA and TUTSA.

The Court accepts arguendo that the Complaint has alleged facts suggesting the possibility

that the Botox Reference Standard could be reverse-engineered. But the Court rejects Defendant's

assertion that the Court *must* conclude from these facts that the Botox Reference Standard is "readily ascertainable through proper means." The fact that a trade secret can be reverse-engineered does not necessarily mean that it is *readily* ascertainable. For example, in *Hauck Mfg. Co. v. Astec Indus., Inc*., 376 F. Supp. 2d 808 (E.D. Tenn. 2005), the jury was confronted with the issue of whether a particular trade secret was readily ascertainable despite the fact that a product similar to the one at issue had been reverse-engineered. On this issue, the court instructed the jury as follows

> Reverse engineering is a process where a person starts with a known product and works backward to determine the secret process by which the product was designed, developed, or manufactured. This goes to whether or not the information claimed to be a trade secret was readily ascertainable. Even if a trade secret could potentially be discovered through reverse engineering *but it would be expensive, difficult, time-consuming, impracticable, or for any other reason not a reasonably desirable option, then trade secret protection would still apply*. One factor you may consider is whether those in the marketplace are actually reverse engineering the product. If the product is being reverse engineered, then this may suggest that it is a reasonably desirable option and the trade secret is readily ascertainable to others. On the other hand, *if the product is not being reverse engineered, then you may consider this in determining whether reverse engineering is truly a reasonably desirable option and the trade secret is readily ascertainable.*

*Id*. at 821. (Emphasis added).

Applying the rationale underlying the jury instruction in *Hauck*, which the Court finds sound, the Court concludes that, where a trade secret *could* be reverse-engineered, but has not been because reverse engineering it "would be expensive, difficult, time-consuming, impracticable, or for any other reason not a reasonably desirable option," a jury may conclude that the trade secret is not readily ascertainable. *Id*. In other words, the fact that something can be reverse-engineered perhaps may necessarily make it "ascertainable." But it does not necessarily make it "readily" ascertainable. So even if (as Defendant essentially says) Plaintiff has alleged facts affirmatively suggesting that the Botox Reference Standard can be reverse-engineered, Plaintiff has not

necessarily affirmatively suggested that the Botox Referenced Standard can be *readily* ascertained. Accordingly, the Court is unwilling to conclude that the Botox Reference Standard does not qualify for trade-secret protection based on Defendant's conclusion that Plaintiff has (supposedly) pled facts affirmatively suggesting that the Botox Reference Standard can be reverse-engineered.

Finally, Defendant argues that the "business" trade secrets[30] included in the Complaint do not qualify as trade secrets because they are so broad that they cannot be distinguished from publicly available information. (Doc. No. 34 at 19). Because of this, Defendant argues, Plaintiff has failed to plead facts with sufficient particularity to state a viable claim. (*Id*.).

The Court rejects Defendant's argument for two reasons. First, as to Defendant's contention that the "business" trade secrets do not qualify as trade secrets, that Court reiterates that the Court must accept as true Plaintiff's allegation that the items listed in ¶ 34 of the Complaint and referred to by Plaintiff as "Allergan Trade Secrets" indeed qualify for trade-secret protection under DTSA and TUTSA. This is so because Plaintiff has supported its assertion that the Allergan Trade Secrets qualify for trade-secret protection (which is a question of fact) with factual matter (that the Court must accept as true) relating to the criteria used to define trade secrets under the DTSA and TUTSA.

---

[30] Plaintiff uses the term "business" trade secrets in the Complaint but does not define the term or otherwise explain which of the Allergan Trade Secrets qualify as "business" trade secrets. (Doc. No. 1 at ¶¶ 33, 68). Defendant uses the term "business" trade secrets in its Memorandum also, but likewise does not define the term. (Doc. No. 34 at 19). So the Court is at a loss as to whether (and, if so, in what sense) there is a material distinction in this case between "trade secrets" and "business trade secrets." For purposes of its analysis, the Court will assume that "business" trade secrets, as referenced by Plaintiff in the Complaint and Defendant in the Memorandum, refers to those trade secrets identified in Paragraph 34(vi) – (ix). The Court makes this assumption because, in its opinion, those portions of the paragraph address items that relate to sales and marketing, whereas the items preceding 34(vi) would be more accurately characterized as relating to biotechnology, manufacturing and the like.

Second, despite being the party that bears the burden for purposes of the instant Motion, Defendant cites to no legal authority that would serve to distinguish Plaintiff's alleged business-related trade secrets differ from other items that have qualified (under such legal authority) for trade-secret protection in this district or others. The DTSA and TUTSA define trade secrets broadly. Under DTSA, "trade secrets are 'all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes,' which the owner has taken reasonable measures to keep secret, and which derive[] independent economic value from that secrecy." *B&P Littleford, LLC v. Prescott Mach., LLC*, No. 20-1449, 2021 WL 3732313, at *5 (6th Cir. Aug. 24, 2021) (quoting 18 U.S.C. § 1839(3)). Similarly, under TUTSA, trade secrets are "information, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan," which the owner has made reasonable efforts to keep secret, and which derive independent economic value from that secrecy. Tenn. Code Ann. § 47-25-1702(4). Consistent with these broad definitions, courts in this district have found that seemingly general descriptions in the plaintiff's complaint of items alleged to be trade secrets qualify for trade-secret protection. For example, in *Great Am. Opportunities, Inc. v. Cherry Bros.*, LLC, No. 3:17-CV-1022, 2018 WL 418567 (M.D. Tenn. Jan. 16, 2018), Judge Trauger was satisfied that the following "confidential business information" sufficiently identified the misappropriated trade secrets:

> [B]usiness plans, marketing and promotional strategies, financial data, sales training materials, actual and potential customer lists and related information, past and current fundraising programs, sales representative contact and performance information, pricing information and strategies, competitive business information, and industry know-how.

*Id.* at *1, *4.

Plaintiff's business-related trade secrets as described in ¶ 34(vi)–(ix) of the Complaint are at least as specific as those mentioned in *Great America*. Accordingly, the Court is satisfied that the business-related trade secrets are properly alleged as trade secrets and are adequate to put Defendant on notice of what was allegedly misappropriated. The Court therefore declines to dismiss Plaintiff's claims on the basis that the Complaint fails to identify the purportedly misappropriated trade secrets with reasonable particularity.

<u>CONCLUSION</u>

It remains to be seen whether Plaintiff's claims ultimately prove meritorious. But those claims are adequately stated under applicable pleading standards, despite Defendant's arguments to the contrary. Accordingly, the Motion (Doc. No. 33) will be DENIED.

An appropriate corresponding order will be entered.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE